EQUAL ACCESS CORPORATION,
Appellant,

v.

UTILITIES BOARD, UTILITIES DI-
VISION, IOWA DEPARTMENT
OF COMMERCE, Appellee,

Office of Consumer Advocate,
Iowa Department of Justice,
Intervenor–Appellant.

No. 92–1330.

Supreme Court of Iowa.

Dec. 22, 1993.

Rehearing Denied Jan. 20, 1994.

**148**

Philip E. Stoffregen and Helen C. Adams of Dickinson, Throckmorton, Parker, Mannheimer & Raife, P.C., Des Moines, for appellant.

James R. Maret, Consumer Advocate, and Gary D. Stewart and Alice J. Hyde, for intervenor-appellant.

Susan Allender, General Counsel, Diane Munns, Deputy General Counsel, and Allan Kniep, Asst. General Counsel, for appellee Utilities Bd.

Considered by McGIVERIN, C.J., and LARSON, NEUMAN, ANDREASEN and TERNUS, JJ.

LARSON, Justice.

Equal Access Corporation is in the business of furnishing telephones in correctional facilities, such as prisons, throughout the country. Equal Access first installed its telephones in Iowa prisons in August 1989. Despite the fact that it had fewer than 15,000 customers in Iowa, and would therefore ordinarily be outside the scope of the utility board's jurisdiction, Iowa Code § 476.1(3) (1991), the board determined that Equal Access was an "alternative operator service" (AOS) under Iowa Code section 476.91.

Equal Access was therefore found to be subject to the jurisdiction of the board and to the tariff requirements of Iowa Code chapter 476. The board found that Equal Access had failed to file tariffs and ordered it to refund all revenues received during the twelve-month period preceding the filing of its tariffs. The district court affirmed, and Equal Access appealed. We affirm.

Only collect calls can be made from the telephones. A collect call is placed through the use of "smart" or "store-and-forward" telephones. These telephones contain computer hardware and software that allow users to make collect calls without the intervention of a live operator. The calling inmate dials "0" and a destination number. A "bong" tone follows, and a voice generated by a computer chip tells the caller to dial "1" to place a collect call. The voice asks for the caller's name. The caller's voice response is recorded by the telephone.

When the inmate's call is answered, a computer chip within the telephone states that it is a collect call and plays back the recording of the caller's voice, stating his name. The receiving party is instructed to dial "1" to accept the call or dial "0," or hang up, to refuse it. The billing data is stored in the telephone, which is prompted each night to upload the record to Equal Access's computer. The answering party is ultimately billed for the call.

A representative of Equal Access testified that the company was a "price follower," that

is that it generally followed AT & T or U S WEST daytime rates, depending on whether the call is interstate or intrastate. (The board concluded that Equal Access was not in fact a "follower" of the established rates because it charged full daytime rates even for calls placed at night or on weekends or holidays when U S WEST and AT & T rates would have been reduced. This is not directly in issue in this case, although as discussed later it is a part of the rationale underlying the board's refund order.)

Several complaints were received by the board, usually involving Equal Access's charges. The board began to investigate, and it found that the company had not filed rate or service tariffs. The board set the matter for hearing. In a proposed order, the administrative law judge found that Equal Access was subject to the jurisdiction of the utilities board and ordered refunds of all revenues received from the beginning of its operation in Iowa in 1989. The board affirmed the decision but modified the amount of refunds to include only income received from operations in the twelve-month period preceding the filing of Equal Access's tariffs.

## I. *Jurisdiction of the Board.*

█ Equal Access contends that it is not subject to the board's jurisdiction or the tariff requirements of Iowa Code chapter 476 because it had fewer than 15,000 customers. *See* Iowa Code § 476.1(3). The Consumer Advocate, who appeared as an intervenor, responded before the board with a novel argument: All persons who are capable of receiving calls from an Iowa inmate are "customers" of the AOS company.

The board rejected this argument, and so do we. If the Consumer Advocate's position were adopted, every telephone company in Iowa would be subject to rate regulation, despite the 15,000–customer threshold of section 476.1(3), because the number of persons in this state who could *receive* telephone calls would be virtually unlimited. This would render meaningless the 15,000–customer requirement of section 476.1(3).

█ The utilities board agreed that Equal Access had fewer than 15,000 customers but concluded nevertheless that it was subject to control under chapter 476 because it is an AOS company. This term

means a nongovernmental company which receives more than half of its Iowa intrastate telecommunications services revenues from calls placed by end-user customers from telephones other than ordinary residence or business telephones. The definition is further limited to include only companies which provide operator assistance, either through live or automated intervention, on calls placed from other than ordinary residence or business telephones, and does not include services provided under contract to rate-regulated local exchange utilities.

Iowa Code § 476.91(1)(a). An "end-user customer" means the person who places a local or toll call. Iowa Code § 476.91(1)(c).

Section 476.91(1)(d) defines "other than ordinary residence or business telephones" for purposes of section 476.91(1)(a) as

telephones other than the residence or business telephones of the customary users of the telephones, including but not limited to pay telephones and telephones in motel, hotel, hospital, and college dormitory rooms.

Without regard to the number of their customers, AOS companies are subject to the jurisdiction of the board and the tariff requirements of chapter 476. *See* Iowa Code § 476.91(2).

For purposes of section 476.91(1)(a), it is clear that Equal Access is a nongovernmental company that receives over half of its revenues from calls placed from telephones other than ordinary residence or business telephones. But Equal Access argues that it is not an AOS company because it does not provide "operator assistance." It is true that an operator, in the traditional sense, is not involved in the calls. However, the definition of an AOS company expressly includes operator assistance "either through live or automated intervention." Inmate calls necessarily require some type of intervention to complete the call. The fact that it is a computer-generated intervention, rather than a live person, is insignificant. (Ironically, Equal Access charged for operator assistance ser-

vices on each call placed, even though it claims there was no "operator assistance" for purposes of section 476.91(1)(a).)

Equal Access also argues that it was not the intent of the legislature that companies such as it be brought under the jurisdiction of the board. The legislative intent, it argues, was to prevent abuse of end-user customers through board oversight, and in the case of prisons, that oversight is unnecessary and inappropriate. Any protection of end-user customers is properly within the control of prison authorities rather than the utilities board, according to the argument.

How prison authorities would police the telephone system, and especially its rates, is far from clear. There was substantial evidence that Equal Access's rates were excessive, yet the prison authorities did not, and probably could not, intervene because the parties affected were the ultimate recipients of the calls, not the inmates.

II. *The Refund.*

■ The utilities board ordered Equal Access to refund all revenues received by it in the twelve months preceding its first filed tariffs. Equal Access argues that, even if it were subject to the jurisdiction of the board under section 476.91, jurisdiction conveyed by that section does not include the authority to set rates or order refunds.

The board concluded that, by including alternate operating companies in chapter 476, the legislature intended to vest power in the board to establish rates. The authority to order refunds follows as a necessary part of rate-setting authority. *See Mid–Iowa Community Action, Inc. v. Iowa State Commerce Comm'n,* 421 N.W.2d 899, 901 (Iowa 1988).

We agree with the board that section 476.-91, in granting the board jurisdiction over AOS companies, included the right to approve tariffs. Section 476.91(2) provides that AOS companies "shall be subject to all requirements and sanctions provided in this chapter." That chapter, of course, includes rate powers. This view is reflected by a rule promulgated by the board:

*Tariffs.* Alternative operator service companies must provide service pursuant to

board-approved tariffs covering both rates and service.

199 Iowa Admin.Code 22.19(2) (1990).

■ Equal Access contends that, even if the board has authority to order refunds, those refunds are limited to the difference between rates actually collected and those that would have been approved by the board. And, under the doctrine of *quantum meruit,* Equal Access cannot be denied all compensation during the twelve-month period but must be allowed at least a reasonable fee for the services provided.

The Consumer Advocate responds that Equal Access should be denied *any* compensation for the services it provided before its tariffs were filed because the charges were unlawful. He relies on Iowa Code section 476.8, which provides:

The charge made by any public utility for . . . communications services, or for any service rendered or to be rendered in connection therewith shall be reasonable and just, and *every unjust or unreasonable charge for such service is prohibited and declared unlawful.*

(Emphasis added.)

In the board's refund order, it attempted to strike middle ground between the Consumer Advocate's request to deny Equal Access any income received prior to its tariffs and the argument of Equal Access that it could only be required to refund revenues to the extent the rates charged were excessive.

The board immediately rejected Equal Access's *quantum meruit* argument because any recovery would be required to be made in accordance with approved rates. Revenues received without proper authority would be illegal, and therefore uncollectible under an equitable theory. *Cf. Kunkle Water & Elec., Inc. v. City of Prescott,* 347 N.W.2d 648, 656 (Iowa 1984) (recovery under *quantum meruit* denied when services rendered under contract void for failing to comply with competitive bidding statute); *Madrid Lumber Co. v. Boone County,* 255 Iowa 380, 386–87, 121 N.W.2d 523, 527 (1963) (same). As we said in *Madrid Lumber Co.,*

[c]ourts of equity can no more disregard statutory requirements than can a court of

law. They are bound by positive provisions of a statute equally with courts of law and where the contract is void because not in compliance with express statutory provisions, a court of equity cannot give validity to the contract.

*Id.* at 387, 121 N.W.2d at 527. Even assuming that the board had authority to grant any form of equitable relief in an agency matter, it properly denied it here.

In fashioning its refund order, the board noted that it was guided by several principles. First, effective regulation requires that the board have the power to enforce the mandates of chapter 476. Second, the tariff filing requirement of chapter 476 is fundamental to effective utility regulation. Third, to adopt an "after the fact" approval of tariffs would not encourage compliance with chapter 476. A utility would not be effectively deterred from failing to file tariffs if it knew that the most it could suffer would be to refund that part of its revenue that was excessive.

The fourth principle is that complaints involving provision of services without a tariff should be resolved efficiently, without other proceedings and the need for lengthy fact-finding proceedings. The board stated that attempting to derive an exact refund formula in this case would consume an inordinate amount of time and board resources and probably would still not yield a mutually acceptable result.

The board considered several aggravating and mitigating factors. On one hand, it found that Equal Access had not only failed to file tariffs but in fact had charged rates greater than those that would have been approved. On the other hand, Equal Access had provided a valuable service to a difficult group of customers. It concluded that some sanctions should be applied but that it would not be just and reasonable to deny Equal Access any revenue from that service.

Despite the argument by the Consumer Advocate that allowing Equal Access to retain any revenue from operations before tariff was filed has the effect of putting the board's imprimatur on an illegal practice, the board allowed Equal Access to retain a portion of its income. The board found that any

violation of the tariff requirements of chapter 476 was not willful for purposes of civil penalties under Iowa Code section 476.51, and that conclusion is not challenged on appeal by the Consumer Advocate.

Regarding the refund to be ordered, the board summarized its views this way:

Ideally the refund amount in this case would be carefully calibrated to prevent Equal Access from benefiting for provision of untariffed services, and to deter other alternative operator services companies from providing services without tariffs. However, the record in this proceeding only allows the Board to estimate the appropriate refund amount to accomplish such a result. It is highly doubtful that an accurate figure could be reached through extended and complex further litigation.

The Board believes the remedy in this case which will satisfy the principles of encouraging tariff filings, not allowing after-the-fact rate making, and recognizing administrative realities is to require Equal Access to refund all jurisdiction revenues, with interest as calculated in Iowa Code § 476.6(13) (1991), for the twelve months immediately preceding the effective date of its first approved tariff, May 24, 1991.

■ Under Iowa Code section 17A.19(8)(g), a court may reverse agency action that is unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. We have held that an agency is free to exercise its expertise within a reasonable range of informed discretion. *Office of Consumer Advocate v. Iowa State Commerce Comm'n,* 419 N.W.2d 373, 374 (Iowa 1988). Discretion is abused when it is exercised on clearly untenable grounds or to a clearly unreasonable extent. *Ashmead v. Harris,* 336 N.W.2d 197, 199 (Iowa 1983). We have noted special deference to agency discretion in utility cases.

In the area of public utility regulation, courts' deference to agency expertise is particularly appropriate. It is a highly technical area, and courts generally will

defer to the agency's decision if it is "within the zone of reasonableness."

Rate-making is not an exact science, and "[s]tatutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high."

*Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 432 N.W.2d 148, 152 (Iowa 1988) (citations omitted).

■ In the present case, we are dealing with refunds, not rate making. However, we believe the factors underlying broad judicial deference to the expertise of the board are equally persuasive in a refund case. We conclude that the board did not abuse its discretion in ordering the refunds.

### III. *The Constitutional Arguments.*

■ A. Equal Access contends that denying it all revenue from the twelve-month period amounts to a deprivation of substantive due process. However, any claim it has to revenue obtained in violation of chapter 476 is tenuous. The most Equal Access can reasonably hope for is that the board would allow recovery of part of it in the exercise of its discretion. Equal Access has not cited, nor have we found, any case recognizing a due process right in property obtained in violation of tariff requirements. We therefore reject this argument.

■ B. Equal Access also contends that section 476.91 is unconstitutional because it denies equal protection to companies (such as it), which derive over half of their revenue from end-user customers on certain telephones. It posits the case of a company with fifty-one percent in such revenues and one receiving only forty-nine percent. However, it is clear that Equal Access derived all of its revenues from end-user customers outside ordinary residences and businesses. Moreover, Equal Access does not argue that section 476.91 requires a heightened level of scrutiny for constitutional purposes. The issue therefore is whether there is a rational basis for the law. We believe there is.

Whereas traditional companies have competitors and natural market forces dictating reasonable rates, Equal Access has exclusively "captive" customers (here, in a very real sense). Under these circumstances, customers are subject to the potential rate abuses that would be unregulated by the board in the absence of a statute such as section 476.91.

We reject Equal Access's constitutional arguments.

### IV. *The Interest Issue.*

■ Equal Access contends that the board lacked authority to include interest on the refund under the provisions of Iowa Code section 476.6(13), which provides:

The board shall determine the rate of interest to be paid by a public utility to persons receiving refunds. The interest rate to be applied to refunds of moneys collected subject to refund under this subsection is two percent per annum plus the average quarterly interest rate at commercial banks for twenty-four-month loans for personal expenditures, as determined by the board, compounded annually. The board shall consider federal reserve statistical release G.19 or its equivalent when determining interest to be paid under this subsection.

Equal Access argues that the interest provision of section 476.6(13) applies only to refunds, under section 476.6, of excessive charges collected under temporary rates, and this is not such a case.

While it is true that the refund order was not based on refunds under temporary rates, we believe that the board may, in its discretion, use the mechanics of section 476.6(13) in computing interest on other refunds.

**AFFIRMED.**