STACEYVILLE COMMUNITY
NURSING HOME,
Appellant,

v.

DEPARTMENT OF INSPECTIONS
AND APPEALS OF the STATE
OF IOWA, Appellee.

No. 94–122.

Supreme Court of Iowa.

March 29, 1995.

---

tions and imposed a $2000 fine. The district court, and we, affirm.

The inspection consisted of an on-site review of the facility and the examination of the records of five residents of the nursing home. All five were deceased at the time. Two registered nurses comprised the department's investigative team.

Iowa Code section 135C.36 provides three classes of violations, depending on their severity. Under section 135C.36(1), a Class I violation

> is one which presents an imminent danger or a substantial probability of resultant death or physical harm to the residents of the facility in which the violation occurs. A physical condition of one or more practices in a facility may constitute a Class I violation.

A Class II violation, under section 135C.36(2),

> is one which has a direct or immediate relationship to the health, safety or security of residents of a health care facility, but which presents no imminent danger nor substantial probability of death or physical harm to them.

The department found that the facility was guilty of a Class I violation. The facility argues that the department did not establish the grounds for a Class I violation, and at the most, the facility was guilty of a Class II violation.

The violations were charged under 481 Iowa Administrative Code 58.14(5) (failing to "notify physician of accident, injury, or adverse change in the resident's condition"), .15(2)(h)(2) (failing to keep a record of "unusual incidents or accidents" or a "change in condition"), and .20(2) (failing to "plan for and direct nursing care, services, treatments, procedures, and other services in order that each resident's needs are met").

The facility contends that the department erred in concluding that any violations caused "imminent danger or substantial probability of resultant death or physical harm" to the five residents so as to constitute a Class I violation. Iowa Code § 135C.36(1). It argues in substance that these residents were "terminal," that death in each case was

Robert J. Baudino, Jr. and Suzane L. Woollums of The Baudino Law Firm, P.C., Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Maureen McGuire, Asst. Atty. Gen., for appellee.

Considered by LARSON, LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.

LARSON, Justice.

The Staceyville Community Nursing Home is a licensed nursing facility under Iowa Code section 135C.16(1) (1991) and therefore is subject to inspection by the Iowa Department of Inspections and Appeals. Iowa Code § 135C.16(1); 481 Iowa Admin.Code 58. Following such an inspection, the department cited the facility for several viola-

imminent, and that any violation of department rules could not have created an "imminent danger of [their] resultant death or physical harm." All five residents were "in a state of rapid deterioration progressing toward a natural death and, as such, their condition changes were expected events," according to it.

### I. *Burden of Proof.*

■ The facility argues that the administrative law judge erroneously placed the burden of proof on the facility to prove compliance with the department's rules. The facility bases this argument on a sentence in the proposed decision, which stated "[t]here was no testimony by [the facility] that the life could not have been prolonged for each of the persons, only that the end result would have remained."

When placed in its context, this statement by the department does not shift the burden of proof. It is obviously a part of the rationale behind the department's rejection of the facility's defense that these residents were terminal and therefore could be afforded a different level of care.

### II. *The Evidence.*

■ Under Iowa Code section 17A.19(8), we review the trial court's affirmance of the agency's decision to determine "whether our conclusions are the same as those of the district court." *Stephenson v. Furnas Elec. Co.*, 522 N.W.2d 828, 831 (Iowa 1994) (citing *Teleconnect Co. v. Iowa State Commerce Comm'n*, 404 N.W.2d 158, 162 (Iowa 1987)). "The district court, and we, accord only limited deference to the agency's interpretation of law, including statutory and agency rule interpretations." *Stephenson*, 522 N.W.2d at 831 (citing *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 908 (Iowa 1987)). The agency's determination of a question of law is given careful consideration, however, in areas of the agency's expertise. *Iowa Health Sys. Agency, Inc. v. Wade*, 327 N.W.2d 732, 733 (Iowa 1982). In addition, we will upset an agency decision only if it is unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole. Iowa Code

§ 17A.19(8)(f); *Stephenson*, 522 N.W.2d at 831.

■ The department based its findings of violations on six of the nine (nonexclusive) factors of 481 Iowa Administrative Code 56.9:

(1) The length of time during which the violation occurred;

(2) The frequency of the violation, *i.e.*, whether the violation was an isolated or a widespread occurrence, practice, or condition;

. . . .

(5) The extent of any harm to the residents or the effect on the health, safety, or security of the residents which resulted from the violation;

(6) The relationship of the violation to any other types of violations which have occurred in the facility, *i.e.*, whether other violations in combination with the violation in question, caused increased harm or adverse effects to the residents of the facility;

. . . .

(8) The accuracy and extent of the records kept by the facility which relates to the violation, and the availability of such records to the department;

(9) The number of other types of related violations occurring simultaneously or within a short period of time of the violation in question.

Resident 351 (these five residents' files are numbered for anonymity) was admitted on October 5, 1984, with a diagnosis of compression fracture to a vertebral body, osteoporosis, deafness, and a hiatal hernia. On December 22, 1990, the records showed that she was sounding congested and "gurgly." She was suctioned at least three times, productive of a large amount of mucous. Despite this development, the facility did not record any vital signs, nor was an adequate nursing assessment completed. The resident was found dead in bed at 8:10 p.m. The physician had never been notified of the condition change. The facility did not contact the doctor until two days after the resident's death.

An expert testifying for the department stated that the nursing care, assessment, and physician notification were either missing or

wholly inadequate; and even if this resident had been in a terminal condition, the facility should have notified the doctor of the symptoms and should have assessed her vital signs and auscultated her lungs.

The record for resident 395 did not show a report of a sudden need for suctioning on two days or vital signs for either day. It also shows the nurses did not perform an adequate assessment or report his 106–degree temperature for nearly twelve hours.

Resident 497 entered the facility on November 27, 1990, with a diagnosis of coronary heart failure, renal failure, leukemia, anemia, atrial fibrillation, and osteoarthritis. Beginning on May 23, 1991, it was difficult to arouse him. On May 24, 1991, a "three plus edema" was noted on both feet. The physician was not notified of either condition. Throughout this period, the facility frequently failed to record his vital signs. The doctor was not notified of a highly elevated temperature for several days. Although the doctor did not believe the resident had suffered an adverse condition change in view of his overall condition, he believed that the resident could have been relieved of some discomfort if he had received additional medical attention.

Resident 507 was admitted on April 24, 1991, with a diagnosis of osteoporosis and an abdominal mass. On May 28, 1991, she was found on the bathroom floor. Nurses' notes stated "no apparent injuries but says right collarbone hurts when touched. Can't see anything." The resident was not assessed for injuries, vital signs were not recorded, and the physician was not notified. Apparently, no x-rays were taken. On May 29 and May 31, the nurses indicated on the charts that the resident apparently was not having as much pain in her arm and shoulder; but on June 1, 1991, the resident complained of coughing during the night. By 9:30 a.m., the resident had shallow respirations, poor response, and "dusky" hands. She died at 1:22 p.m. that day. The department found that the nursing staff failed to assess her condition immediately after the fall as they should have done. They did not provide the vital signs at that time for future reference to determine if she was in a stable or deteriorating condition.

Resident 508 entered the facility on May 2, 1991. On May 22, he had a temperature of 101.3°. On May 23, it was noted that he "seems very shaky and weak today." Vital signs were recorded at that time. The resident continued to complain that he was not feeling well during the next few days, but no assessment was documented and no vital signs were recorded from May 27, 1991, through June 1, 1991, two days before his death. A member of the family insisted shortly before his death that he be seen by a physician and ultimately transported him in her car to a hospital emergency room. The diagnosis was a fractured left hip. He died one day later.

According to the department, the facility failed to provide a continuing assessment even after noting a rapid pulse and elevated temperatures. At various times between May 21 and May 31, only sporadic vital sign and assessment records were made. On June 2, 1991, it was noted that his temperature was only 91.5°, significantly below normal. The facility suggests that the low temperature may have been the result of drinking cold liquids or eating cold foods; however, by the next morning, his condition had drastically deteriorated. No attempt was made to retake his temperature to determine if the abnormally low reading was an aberration or a true reading.

III. *The Conclusions.*

The definition of a Class I violation permits the department to aggregate violations. "A physical condition or one or more practices in a facility may constitute a Class I violation." Iowa Code § 135C.36(1). The department concluded that section 136C.36(1) had been satisfied, but the facility attacks that finding on three grounds: It was (1) affected by an error of law, (2) unsupported by substantial evidence, and (3) unreasonable and characterized by an abuse of discretion. *See* Iowa Code § 17A.19(8)(e)–(g) (grounds for reversal of agency ruling).

The department was not required to show a cause-and-effect relationship between the facility's practices and the ultimate effect on

these five residents. When the evidence from these five files are considered together, they provide substantial evidence to support the finding that the facility's actions create a substantial likelihood of harm to all of the residents. Section 135C.36(1), moreover, is not limited to cases involving substantial probability of death; it applies as well if there is a substantial probability of "physical harm" to the residents.

The argument by the facility that they could justifiably treat these five residents differently because they were "terminal" is not supported in the statute or rules. There was no evidence as to how, or even if, these patients were deemed to be "terminal." We find no merit in this defense, anyway. As the administrative law judge aptly noted,

> [i]t is not included within the discretion for [the facility] to reduce the level of nursing care for "terminal" patients. That discretion is left with the physician for medical care, and based on the wishes of the resident and/or family. By failing to contact a physician when residents began to have adverse physical symptoms, the nursing home was, in effect, substituting their judgment for that of the physician. I can find neither expressed, nor implied, authority to change nursing care due to ... the terminal status of the patient. Indeed, that is the purpose of having the patient or resident in a facility with a full-time nursing staff.

## IV. The "Unreasonable and Abuse of Discretion" Argument.

Finally, the facility argues that the department acted unreasonably and abused its discretion in finding it to have committed a violation of the Class I statute. In substance, the argument is that the agency failed to consider certain evidence presented by the facility. To a large extent, the argument under this issue overlaps the argument concerning the sufficiency of the evidence and the agency's interpretation of the statute. For the reason set out in the discussion above, we reject those arguments.

In addition, this is a highly specialized field. As we said in *Equal Access Corp. v.* *Utilities Board*, 510 N.W.2d 147, 151 (Iowa 1993),

> [u]nder Iowa Code section 17A.19(8)(g), a court may reverse agency action that is unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. We have held that an agency is free to exercise its expertise within a reasonable range of informed discretion. Discretion is abused when it is exercised on clearly untenable grounds or to a clearly unreasonable extent.

(Citations omitted.)

We believe that the decision made by the department, based on evidence from experts in the field, sufficiently supported the ruling. Further, it was not affected by any errors of law or by unreasonable actions by the agency characterized by an abuse of discretion. Accordingly, we affirm the district court and the department.

**AFFIRMED.**