**MADRID HOME FOR THE AGING, Appellant,**

v.

**IOWA DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL SERVICES, Appellee.**

No. 95–2064.

Supreme Court of Iowa.

Dec. 18, 1996.

Steven M. Nadel and Mark W. Beerman of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Daniel W. Hart, Assistant Attorney General, for appellee.

ANDREASEN, Justice.

This is an appeal from a judgment entered by the district court, affirming the final decision of the Iowa Department of Human Services (DHS). The court concluded that the reimbursement rates, paid to a skilled nursing care facility under the Iowa Medicaid program, satisfied the provisions of federal and state law. We affirm.

## I. Background Facts and Proceedings.

Madrid Home for the Aging (Madrid Home) is a skilled nursing care facility in Madrid, Iowa. It provides skilled nursing care and services to needy persons under the Iowa Medicaid program, which is administered by the DHS. *See* Iowa Code ch. 249A (1993). A portion of Madrid Home's expenses are reimbursed under the program.

In April 1993, William Thayer, the President and CEO of Madrid Home, sent a written complaint to the Health Care Financing Administration (HCFA), the agency administering the Medicaid program at the federal level. Thayer's complaint was against DHS and concerned its reimbursement rates. The reimbursement rate represents the amount that a skilled nursing facility receives "per patient, per day." In the letter, he argued that Iowa was not operating its Medicaid program for long-term care skilled facilities within the intent of the law. At the time, DHS was still using 1984 as the base year in its rate determination. Specifically, Thayer wanted HCFA to direct DHS to increase its reimbursement rates to reflect present costs.

In response to this complaint, Gene Hyde, the HCFA Regional Administrator, assured Thayer that all reimbursement payments under the state plan would comply with federal requirements. Hyde stated that HCFA would determine whether the reimbursement methodology results in rates which are reasonable and adequate to meet the costs that must be incurred by an efficiently and economically operated provider.

Following a review of their policy, DHS agreed to establish new rates, effective February 1, 1994. It planned to "rebase" its rates by establishing a new base year, using more current costs. DHS chose 1991 as its

new base year because, at the time of rebasing, that was the year with the most recent finalized reports of actual costs. As a result, DHS still had to bring 1991 costs up to date to 1994. To do this, DHS used the rate increases that had been granted to skilled nursing facilities, by the state legislature, between 1991 and 1994. During that period, the legislature provided no rate increase for fiscal year 1992–93 (the fiscal year runs from July 1 to June 30). For fiscal year 1993–94, the legislature appropriated a 4.3% increase.

Therefore, DHS increased 1991 costs by 4.3% to arrive at the reimbursement rate, which became effective on February 1, 1994. DHS did not use an inflation factor for fiscal year 1992–93. Following the rebasing process, DHS amended its administrative rule to reflect the rebasing. *See* Iowa Admin.Code r. 441–79.1(9) (1993). In addition, the amendments also provided for rebasing of skilled nursing care facility rates every three years. Iowa Admin.Code r. 441–79.1(9)(I).

DHS initially notified Madrid Home that its new reimbursement rate would be $91.74, effective February 1, 1994. In July, DHS sent a letter to Madrid Home, stating that the reimbursement rate effective February 1 was actually $89.00, not $91.74. In that same letter, Madrid Home was also informed that effective July 1, its rate was being raised again, from $89.00 to $93.36, based on a 4.9% increase in the legislative appropriation. In a letter dated July 14, Thayer complained to DHS about the February rate change. In its response, DHS told Thayer that the $91.74 rate was a preliminary calculation based on different inflation factors. DHS also stated that even though Madrid Home did not get its official notice until July, DHS had been reimbursing Madrid Home at the new rate of $89.00 since February 1.

DHS treated Thayer's letter as an appeal, which was docketed as a contested case proceeding. *See* Iowa Code § 17A.12. Following a hearing, the administrative law judge (ALJ) issued a proposed decision, which stated that the action of DHS in establishing a new reimbursement rate for skilled nursing care services was correct. The Director of DHS adopted the proposed decision of the ALJ with some additional conclusions of law.

The Director concluded that DHS's rate and its methodology complied with both state and federal law governing Medicaid reimbursement. Madrid Home filed a petition for judicial review challenging DHS's decision. Following a hearing, the district court entered a decision on November 6, 1995, affirming DHS's decision. The court stated:

[T]he Medicaid reimbursement rate, the DHS methodology and the Director's Final Decision do not violate [federal law]. The rebasing methodology including a zero percent inflation factor for fiscal year 1993 violates neither [federal law] nor the Iowa Administrative Code. The decision of the Director is not affected by error of law. It is supported by substantial evidence. It is not arbitrary or capricious.

Madrid Home filed a notice of appeal.

II. *Scope of Review.*

■■ Judicial review of a contested proceeding, both in the district court and the appellate courts, is to correct errors at law. Iowa Code § 17A.19; *Sahu v. Iowa Bd. of Med. Exam'rs*, 537 N.W.2d 674, 676 (Iowa 1995). In other words, our review pursuant to Iowa Code section 17A.20 is not de novo. *UNI–United Faculty v. Iowa Pub. Employment Relations Bd.*, 545 N.W.2d 274, 278 (Iowa 1996). We will uphold the agency's action if it is supported by "substantial evidence in the record made before the agency when that record is viewed as a whole." Iowa Code § 17A.19(8)(f); *Pointer v. Iowa Dep't of Transp.*, 546 N.W.2d 623, 625 (Iowa 1996). Evidence is substantial when a reasonable person could accept it as adequate to reach the same findings. *Pointer*, 546 N.W.2d at 625. The ultimate question is not whether the evidence supports a different finding, but whether the evidence supports the findings actually made. *Id.* Therefore, an agency's findings of fact are binding on appeal unless a contrary result is deemed as a matter of law. *UNI–United Faculty*, 545 N.W.2d at 278.

■■ We are not bound by the agency's legal conclusions. *Stroup v. Reno*, 530 N.W.2d 441, 443 (Iowa 1995). We accord only limited deference to the agency's inter-

pretation of law, including statutory and agency rule interpretations. *Staceyville Community Nursing Home v. Department of Inspections & Appeals,* 528 N.W.2d 557, 559 (Iowa 1995). However, the agency's determination of a question of law is given careful consideration in areas of the agency's expertise. *Id.* For example, in cases involving interpretation of statutes that affect an agency's work, we defer to the agency's expertise unless the suggested interpretation is clearly erroneous. *Wiebenga v. Iowa Dep't of Transp.,* 530 N.W.2d 732, 734 (Iowa 1995).

### III. *Validity of Madrid Home's Reimbursement Rate.*

The narrow issue before us is whether the DHS's use of a zero percent inflation factor for fiscal year 1992–93, as part of its calculation for the reimbursement rate effective February 1, 1994, violates federal law (specifically the Boren Amendment of the Social Security Act) or an Iowa Administrative Code rule. Before addressing the arguments raised by Madrid Home, we will discuss the background of Medicaid and the Boren Amendment.

### A. Background of Medicaid and the Boren Amendment.

Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. *See* 42 U.S.C. § 1396 (1994); *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455, 462 (1990). Although participation in the program is voluntary, participating states must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of the United States Department of Health and Human Services (Secretary). *Wilder,* 496 U.S. at 502, 110 S.Ct. at 2513, 110 L.Ed.2d at 462. To qualify for federal assistance, a state must formulate a plan and submit it to HCFA for approval. *Id.; Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehabilitation Servs.,* 31 F.3d 1536, 1538 (10th Cir.1994). Among other things, the state plan is required to establish a scheme for reimbursing health care provid-

ers for the medical services provided to needy individuals. *Wilder,* 496 U.S. at 502, 110 S.Ct. at 2513, 110 L.Ed.2d at 462.

After the plan is approved, the federal government then reimburses the state for a percentage of the program's expenses, including administrative costs and other program-related expenses. *Connecticut Hosp. Ass'n v. Weicker,* 46 F.3d 211, 213 (2d Cir. 1995). Until 1980, states reimbursed providers for the "reasonable cost" of services actually provided to Medicaid patients. *Wilder,* 496 U.S. at 505, 110 S.Ct. at 2515, 110 L.Ed.2d at 464; *Weicker,* 46 F.3d at 213. In other words, providers were paid for their actual costs incurred, regardless of disparities in costs or efficiencies among providers. *New Jersey Hosp. Ass'n v. Waldman,* 73 F.3d 509, 511 (3d Cir.1995). This "retrospective" process of payment proved over time to be inherently inflational and contained no incentives for efficient performance. *Weicker,* 46 F.3d at 213.

In 1980, Congress enacted the Boren Amendment to the Social Security Act, which changed the standard for reimbursement of nursing and intermediate care facilities. *See* 42 U.S.C. § 1396a(a)(13)(A); *Wilder,* 496 U.S. at 502 n. 2, 110 S.Ct. at 2513 n. 2, 110 L.Ed.2d at 462 n. 2. Since its passage, the Amendment has also been made applicable to hospitals and intermediate care facilities for the mentally retarded. *Wilder,* 496 U.S. at 502 n. 2, 110 S.Ct. at 2513 n. 2, 110 L.Ed.2d at 462–63 n. 2. The Boren Amendment provides:

A state plan for medical assistance must ... provide for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure

that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality. 42 U.S.C. § 1396a(a)(13)(A). HCFA has issued regulations to implement this Amendment. *See* 42 C.F.R. §§ 447.250–.280 (1995).

While Congress affirmed its desire that state rates be "reasonable," it afforded states greater flexibility in developing Medicaid reimbursement methodologies. *Wilder,* 496 U.S. at 506, 110 S.Ct. at 2516, 110 L.Ed.2d at 465. In other words, in passing the Boren Amendment, Congress sought to decentralize the method for determining rates, but not to eliminate a state's fundamental obligation to pay reasonable rates. *Wilder,* 496 U.S. at 515, 110 S.Ct. at 2520, 110 L.Ed.2d at 470–71. Under the Amendment, states now have significant discretion to establish statewide or classwide rates, rates based on a prospective cost, or incentive provisions to encourage efficiency. *Id.* at 506–07, 110 S.Ct. at 2516, 110 L.Ed.2d at 465. Flexibility is ensured by limiting federal oversight. *Id.*

Currently, a state's Medicaid plan must provide reimbursement to providers at rates which the state finds "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...." 42 U.S.C. § 1396a(a)(13)(A); *see Wilder,* 496 U.S. at 507, 110 S.Ct. at 2516, 110 L.Ed.2d at 465. In order to receive HCFA's approval and qualify for federal financial support, a state must submit a "state plan" or a change in payment methods or standards to HCFA. *Waldman,* 73 F.3d at 512. Compliance with the Boren Amendment involves both procedural and substantive components, and each creates rights enforceable by 42 U.S.C. § 1983. *Kansas Health Care,* 31 F.3d at 1539; *see Wilder,* 496 U.S. at 509–10, 110 S.Ct. at 2517, 110 L.Ed.2d at 467.

Under the procedural component, the state must (1) make findings and (2) give assurances to HCFA that its program comports with federal requirements. *Wilder,* 496 U.S. at 507, 110 S.Ct. at 2516, 110 L.Ed.2d at 465; *Waldman,* 73 F.3d at 512. A state is required to make a finding, at least annually, that its rates are "reasonable and adequate." *See* 42 C.F.R. § 447.253(b); *Wilder,* 496 U.S.

at 507, 110 S.Ct. at 2516, 110 L.Ed.2d at 466. However, a state is only required to submit assurances to HCFA when it makes a change in its reimbursement rate. *See* 42 C.F.R. § 447.253(a); *Wilder,* 496 U.S. at 507, 110 S.Ct. at 2516, 110 L.Ed.2d at 466.

With the "findings" requirement, a state must, at a minimum,

make "findings" which identify and determine (1) efficiently and economically operated [facilities]; (2) the costs that must be incurred by such [facilities]; and (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated [facilities].

*Kansas Health Care,* 31 F.3d at 1539 (quoting *AMISUB (PSL), Inc. v. Colorado Dep't of Soc. Servs.,* 879 F.2d 789, 796 (10th Cir. 1989)); *see Weicker,* 46 F.3d at 217; *Folden v. Washington State Dep't of Soc. & Health Servs.,* 981 F.2d 1054, 1057 (9th Cir.1992). While a state is free to create its own method for arriving at the required findings, the requirement is not a mere formality. *See Wilder,* 496 U.S. at 514, 110 S.Ct. at 2520, 110 L.Ed.2d at 470; *Kansas Health Care,* 31 F.3d at 1539. When "assurances" are submitted to HCFA, they are reviewed to determine their reasonableness. *Wilder,* 496 U.S. at 507, 110 S.Ct. at 2516, 110 L.Ed.2d at 466. The findings are not reviewed by HCFA. *Id.*

The Boren Amendment also contains a substantive component, which requires a state to find that its rates are reasonable and adequate to meet the costs of an efficiently and economically operated facility. *See id.* at 510, 110 S.Ct. at 2517, 110 L.Ed.2d at 467. To satisfy this component, a state's Medicaid payments must fall within a "zone or range of reasonableness." *Kansas Health Care,* 31 F.3d at 1536; *Folden,* 981 F.2d at 1058. In fact, HCFA has declined to prescribe a precise number for the term "reasonable and adequate." It stated that the term is "a rate which falls within a range of what could be considered reasonable and adequate." 48 Fed.Reg. 56,049 (1983); *see also Waldman,* 73 F.3d at 515; *Folden,* 981 F.2d at 1058. Thus, a state must merely show a rational basis for its Medicaid program, which re-

quires a rational connection between the facts found and the choices made. *Waldman,* 73 F.3d at 515; *Kansas Health Care,* 31 F.3d at 1540.

### B. DHS's Compliance with the Boren Amendment.

Madrid Home argues that DHS's February 1994 reimbursement rate and its use of a zero percent inflation factor for fiscal year 1992–93 violate the Boren Amendment. We reject Madrid Home's arguments and conclude that the actions of DHS complied with federal law.

▮ In arguing that DHS's actions are contrary to federal law, Madrid Home contends that DHS violated both the procedural and substantive components of the Boren Amendment. First, Madrid Home claims that DHS violated the Amendment's procedural mandate by failing to make the mandatory annual findings to support its February 1994 rate. It is true that DHS made no specific, formal, or written findings that its rebased reimbursement rate was reasonable and adequate to meet the costs of an efficiently operated skilled nursing facility. However, explicit findings are not required.

▮ Even though the "findings" requirement is mandatory, the Boren Amendment does not require a formal, detailed, or technical findings process. *New Jersey Ass'n of Health Care Facilities, Inc. v. Gibbs,* 838 F.Supp. 881, 894 (D.N.J.), *aff'd mem.,* 14 F.3d 48 (3d Cir.1993). A state is free to create its own method of findings. *Waldman,* 73 F.3d at 518; *Folden,* 981 F.2d at 1057; *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1315 (2d Cir.1991); *AMISUB,* 879 F.2d at 797. In fact, the findings process does not even require special studies or written findings. *Folden,* 981 F.2d at 1057; *Gibbs,* 838 F.Supp. at 894; *Colorado Health Care Ass'n v. Colorado Dep't of Soc. Servs.,* 842 F.2d 1158, 1168 (10th Cir.1988). It is sufficient if a state has considered, on the basis of some reasonably principled analysis, whether its payment rates meet the substantive requirements of the Boren Amendment. *Folden,* 981 F.2d at 1057; *Gibbs,* 838 F.Supp. at 895. In fact, there is a presumption that a state will engage in a bona fide finding pro-

cess before it makes assurances to HCFA that the required findings have been made. *Kansas Health Care,* 31 F.3d at 1536; *AMISUB,* 879 F.2d at 797; *Gibbs,* 838 F.Supp. at 894.

Madrid Home has failed to establish that DHS did not engage in a bona fide fact finding process. The evidence in the record indicates that DHS satisfied the "findings" requirements set forth in *Kansas Health Care.* During its rebasing process, DHS defined which facilities are "efficient and economically operated." It revised its administrative rule to read that "Effective February 1, 1994, a ceiling of allowable cost shall be established at ... the sixty-ninth percentile for freestanding facilities. The allowable cost shall be weighted by Medicare patient days." Iowa Admin.Code r. 441–79.1(9)(d). This meant that DHS subjected its rates to a cap, set at the sixty-ninth percentile of all facilities' costs. In other words, DHS will not pay a skilled nursing care facility more than the costs of the facility that was at the sixty-ninth percentile. Madrid Home's costs are below this, so it is not affected by the cap.

DHS also determined the costs that are incurred by the skilled nursing care facilities. The entire purpose of the rebasing process was to bring reimbursement rates in line with current costs of efficiently operated facilities. To do this, DHS took the most recent figures available, 1991 costs, and updated them to 1994.

Finally, the evidence indicates that DHS conducted an objective analysis and fact-finding process to determine the effects of its rates on the level of care Medicaid patients receive. *See Abbeville Gen. Hosp. v. Ramsey,* 3 F.3d 797, 805 (5th Cir.1993). In response to requests by Madrid Home and HCFA, the DHS updated its reimbursement rates to reflect current costs. The rebasing process, as a whole, shows a nexus between the costs of operating efficient facilities and the reimbursement rate under the state plan. *See Axelrod,* 928 F.2d at 1314. We conclude that substantial evidence in the record indicates that DHS complied with the procedural requirements of the Boren Amendment.

■ Madrid Home's second argument is that DHS violated the Boren Amendment by using an inflation factor based solely on alleged appropriations by the state legislature. Stated otherwise, Madrid Home is essentially claiming that DHS's methodology resulted in an unreasonable rate and violated the substantive component of the Amendment. We conclude there was no violation.

■ Budget considerations cannot excuse noncompliance with federal Medicaid law. *Arkansas Med. Soc'y, Inc. v. Reynolds,* 6 F.3d 519, 531 (8th Cir.1993); *Ramsey,* 3 F.3d at 809; *AMISUB,* 879 F.2d at 800. However, DHS may take state budget factors into consideration when setting its reimbursement methodology, even though it may not ignore federal requirements in order to suit budgetary needs. *Reynolds,* 6 F.3d at 531; *AMISUB,* 879 F.2d at 800–01. Further, individual components of a reimbursement rate do not determine compliance with the Boren Amendment. *Kansas Health Care,* 31 F.3d at 1540; *Gibbs,* 838 F.Supp. at 899. The resulting overall payment is what is evaluated for statutory compliance. *Kansas Health Care,* 31 F.3d at 1540; *Colorado Health Care,* 842 F.2d at 1167.

We believe substantial evidence in the record supports DHS's conclusion that its February 1, 1994 reimbursement rate of $89.00 falls within the zone of reasonableness contemplated by the Boren Amendment. In updating its 1991 costs to 1994, DHS chose to use inflation factors established by legislative appropriations. Therefore, because the legislature did not appropriate a rate increase for fiscal year 1992–93, DHS used a zero percent increase for fiscal year 1992–93. However, DHS did not rely solely on budget considerations. It also examined the actual costs of facilities.

The reimbursement rate merely represents DHS's judgment of what rates will both reflect the actual costs incurred, and also allow it to comply with its appropriations limitations. DHS considered more than just the amount of money to be saved. It defined what "efficiently and economically operated facilities" are and looked at actual cost data of those facilities. Its resulting payment falls within the range of what could be con-

sidered reasonable and adequate, as Congress mandated. *See Colorado Health Care,* 842 F.2d at 1168. Further, there are important policy reasons for allowing a state to consider budgetary constraints in determining its payment rates. In *Gibbs,* the United States District Court in New Jersey stated:

the Boren Amendment does not require a state to guarantee that rates will increase in lock step with industry costs. The Boren Amendment was enacted in response to Congressional concerns that health care costs were increasing at rates far in excess of inflation. It would be contrary to the cost containment goals of the Boren Amendment to hold that states must ensure that payment rates to all facilities increase at the same rate at which nursing home costs increase.

*Gibbs,* 838 F.Supp. at 915–16.

It is important to remember that DHS's rebased rate, which became effective on February 1, 1994, increased 1991 costs by 4.3%, based on the legislature's appropriation for fiscal year 1993–94. The rate was again raised on July 1, 1994, by 4.9%. In addition, Madrid Home has failed to demonstrate that DHS's rebased reimbursement rate does not reasonably cover the costs incurred by an efficiently operated facility. We conclude substantial evidence in the record indicates that DHS complied with the substantive component of the Boren Amendment.

### C. DHS's Interpretation of Rule 441–79.1(9).

■ Madrid Home's next argument is that DHS's application of Iowa Administrative Code rule 441–79.1(9) was erroneous. Essentially, Madrid Home is claiming that the rule mandates that rates be based on actual costs, and that DHS's failure to include an inflation factor for fiscal year 1992–93 violated the requirement that an "annual index" be applied to the base year per diem. We find no violation of the rule.

Despite the amendments to rule 441–79.1(9) during the rebasing process, DHS did not change the basic provision that "Reimbursement shall be prospective based on a per diem rate calculated for each facility by

establishing a base year per diem to which an annual index is applied." Iowa Admin.Code r. 441–79.1(9). Based on the plain language of the rule, a "base year per diem" must be established before an "annual index" is applied. Here, DHS's use of a zero percent inflation factor for fiscal year 1992–93 was part of the methodology used to *establish* the base year per diem, which became effective on February 1, 1994. No annual index was required until after this effective date.

█ Further, Madrid Home argues that DHS erred in interpreting the annual index requirement as being inherently connected with the state legislature's appropriations. This argument is contrary to the long-standing practice in this state, in which the state legislature sets the annual increase in nursing care facility rates in the appropriation process. We conclude DHS did not violate Iowa Administrative Code rule 441–79.1(9).

D. Significance of HCFA's Approval.

Finally, Madrid Home argues that DHS placed undue emphasis on HCFA's approval of the state plan in concluding that its action complied with federal law. We need not address this issue because we have already concluded that DHS satisfied the Boren Amendment and the Iowa Administrative Code rule.

IV. *Conclusion.*

We conclude that substantial evidence in the record supports DHS's actions. We find no violation of the procedural or substantive requirements of the Boren Amendment and no violation of the Iowa Administrative Code rule. We have considered Madrid Home's other arguments and find them to be without merit. We affirm the district court's decision.

**AFFIRMED.**

All Justices concur except HARRIS, J., who takes no part.