373 P.2d 340

David C. DAVIS, J. W. Spray and Jay Bateman, members of and constituting the Board of Supervisors of Pinal County, Arizona, Appellants,

v.

D. R. BRITTAIN, John O. Combs and J. G. Waggoner, on behalf of Petitioners, Appellees.

In the Matter of the Petition of Certain Freeholders for the Formation of an Electrical District in Pinal and Maricopa Counties, Arizona.

No. 6728.

Supreme Court of Arizona.

En Banc.

July 6, 1962.

As Corrected July 13, 1962.

Rehearing Denied Sept. 18, 1962.

T. J. Mahoney, Former County Atty.,. Pinal County, E. D. McBryde, County Atty., Pinal County, Beverly J. McCon-.

nell, Sp. Asst. County Atty., Pinal County, for appellants.

Stokes, Bagnall & Moring, Collidge, and Kramer, Roche, Burch & Streich, Phoenix, for appellees.

Nicholas H. Powell, Perry Ling and Snell & Wilmer, Phoenix, for Arizona Public Service Co., amicus curiæ.

Darnell, Holesapple, McFall & Spaid, Tucson, and Jennings, Strouss, Salmon & Trask, Phoenix, for Tucson Gas, Electric Light & Power Co., amicus curiæ.

Evans, Kitchel & Jenckes, Phoenix, for Citizens Utilities Co., amicus curiæ.

Wolfe & Becks, Tucson, for petitioners in Pima County, amicus curiæ.

Rawlins, Davis, Ellis, Burrus & Kiewit, Phoenix, for Electrical District No. Three, Pinal County, Arizona and Electrical District No. Four, Pinal County, Arizona, amicus curiæ.

A. Van Wagenen Jr., Phoenix, for Electrical District No. Two, Pinal County, Arizona and Electrical District No. Five, Pinal County, Arizona, amicus curiæ.

LOCKWOOD, Justice.

This is the decision upon rehearing of the case originally decided by this court on December 30, 1960 and reported in 89 Ariz. 89, 358 P.2d 322.

In 1957 landowners in the "Queen Creek Area" of Arizona's Pinal and Maricopa Counties petitioned the Pinal County Board of Supervisors (hereafter called the Board) to organize an electrical district. It is undisputed that: the proposed district comprises about 51,000 acres; the land therein is incapable of being farmed in its natural state and is almost entirely under cultivation through irrigation; the water is pumped from deep wells by means of electric or gas power; electricity is furnished by Arizona Public Service Company and Salt River Project Agricultural Improvement and Power District and gas is supplied by Arizona Public Service Company and Magma Gas Company; the entire district is within a critical groundwater area as designated by the State Land Department so new lands therein cannot now be brought into cultivation.

The motive behind the formation of the district is to obtain power at a lower cost. There was uncontradicted testimony that the water table was becoming lower and thus it was becoming impossible to pump water for irrigation except at greater expense. This increasing cost was in turn forcing back to the desert the cultivated lands of those unable to meet the higher power prices. Districts, such as the one being sought by the landowners, are able to obtain first priority rights to electrical power available to the Arizona Power Authority, thereby: a) enabling them to purchase power at lower rates, and b) giving them a preference in time of a shortage.

Based upon the costs to farmers in other electrical districts, the savings through the formation of a district would be about twenty-five per cent of the present cost of power. Landowners testified that the savings would enable them to pump water as the level lowered and thus would keep farmers in business and lands in cultivation which would otherwise be forced out.

On October 21, 1957 the Board denied the landowners' petition on the grounds that the requirements of A.R.S. § 30–505, subd. A (1956) had not been complied with. This section reads:

"A. At the hearing on the petition called by the board of supervisors, it shall first proceed to determine whether the operations as proposed will constitute a public use. The board shall for such purpose determine:

"1. Whether the lands in the proposed district are arid lands.

"2. Whether they are fertile and reclaimable.

"3. Whether there is a supply of water which can be made efficiently available by the proposed power system.

"4. Whether the development reasonably certain to result from the production of power is of such interest and benefit to the whole district as to impress it with a public use."

The landowners thereupon appealed to the Superior Court of Pinal County which, after a trial de novo, vacated the Board's order and decreed that it proceed to organize the electrical district.

The Board then appealed to this court assigning eight errors, and we reversed the trial court, stating:

"It seems clear to us and we so hold that these fertile arid desert lands which have already been brought under cultivation and which are producing agricultural crops as a result of an irrigation system and having in fact been reclaimed from their natural state must in law be considered as reclaimed lands and thus not 'reclaimable' as intended by the Arizona statute.

"The conclusion of the trial court under the second requirement of the statute in question was, therefore, error. Consequently, it is unnecessary, under our practice, to consider further questions raised by appellants." 89 Ariz. at 99, 358 P.2d at 329.

Motion for rehearing was granted to correct certain errors in the original decision. We reaffirm our holding concerning the nature of a trial de novo, but reconsider each of the other assignments of error made by the Board. In part I we

deal with the four assignments involving the trial court's findings that sub-paragraphs (1), (2), and (3) of A.R.S. § 505, subd. A, supra, have been complied with, and in part II with three assignments which pose a single question: May there be a public use when the formation of a district will not result in the bringing into production of theretofore uncultivated lands?[1]

I

A.R.S. § 30–505, subd. A(1), (2) and (3) requires a finding that the lands in the proposed district are arid, fertile and reclaimable, and that there is a supply of water which can be made efficiently available by the proposed power system. The Board contends that since the land is already under cultivation it can no longer be found to be "arid" or "reclaimable", and that there was no evidence that the proposed system would make water efficiently available.

We believe that the words "arid" and "reclaimable", as used in the statute, must be read as referring to the very nature of the land, which is not changed by subsequent irrigation and cultivation. The United States Supreme Court in Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896), a case involving the validity of California's "Wright Law",[2] was faced with this question: could an irrigation district include "all lands, no matter how fertile or productive, so long as they are susceptible, 'in their natural state,' of one mode of irrigation from a common source, etc." ?[3] In answering "yes" the Court quoted with approval from Board of Directors of Modesto Irrigation Dist. v. Tregea, 88 Cal. 334, 353, 26 P. 237 (1891):

"We construe the act to mean that the board may include in the boundaries of the district all lands which in their natural state would be benefited by * * * one system, * * *."

Although the fact situations in both the Fallbrook[4] and Modesto[5] cases are distinguishable from the case at bar, they

---

1. The eighth assignment dealt with the nature of a trial de novo which was thoroughly discussed and correctly determined in the original decision.
2. We said in In Re Auxiliary Eastern Canal Irr. Dist., 24 Ariz. 163, 168, 207 P. 614, 615 (1922) that the 1915 and 1921 Arizona enactments providing for the organization of irrigation districts "are in all essential features like the Wright Law as amended from time to time, and the laws of the other named states. In fact, it is certain such laws

were used as a guide in the drafting of ours."
3. 164 U.S. at 164, 17 S.Ct. at 65.
4. Fallbrook was concerned with "land which can, to a certain extent, be beneficially used without artificial irrigation, [but] may yet be so much improved by it that it will be thereby, and for its original use, substantially benefited, * * *." 164 U.S. at 167, 17 S.Ct. at 66.
5. Modesto was concerned with "the fact that buildings or other structures may have been erected here and there upon

nevertheless clearly demonstrate an intention to allow lands which in their *natural state* could be benefited by irrigation, to be included within districts.

It was with these cases in mind that this court in Kinne v. Burgess, 24 Ariz. 463, 211 P. 573 (1922) found unconstitutional the 1915 Arizona law under which an electrical district had been formed. We said in 24 Ariz. at 469, 211 P. at 575:

"Before the principle, upon which gravity irrigation districts are upheld, could be applied to a power irrigation district, it would be necessary that the lands proposed to be irrigated be *arid lands susceptible of irrigation*." (Emphasis added.)

■ The following year the act that is presently A.R.S. § 30–501 et seq. was passed and in order to comply with the Kinne case provided: "The board shall determine whether or not the lands in the proposed district are arid lands, whether they are fertile and reclaimable, * * *."[6] In Hall v. Carter, 33 Tex.Civ.App. 230, 77 S.W. 19, 21 (1903) the following instruction in regard to the meaning of "arid" was approved by the appellate court:

" 'by "arid portions of the state" is meant those portions of the state where rainfall is insufficient for agricultural purposes, and irrigation therefore necessary.' "

Webster's Third New International Dictionary (1961) defines "arid" as follows:

"without moisture: excessively dry: parched and barren: *specif[ically]*: having insufficient rainfall to support agriculture, usu[ally] less than 10 to 15 inches annually * * *".

It is thus apparent that the term "arid" has reference to the very nature of the lands and applies even though there may be irrigation and cultivation. There is ample evidence in the instant case that the annual rainfall is less than nine inches and is insufficient to support agriculture; therefore the lands within the proposed district are arid lands.

■ Webster's Dictionary defines "reclaim" as: "to rescue from a wild or uncultivated state: make fit for cultivation or use" and "reclaimable" as "capable of being reclaimed". Thus "reclaimable" was used in the act to distinguish lands capable of being reclaimed from those craggy mountain peaks which have no such capacity and are "irreclaimable". In our original decision we interpreted "reclaimable" as being synonymous with "unreclaimed" and the opposite of "reclaimed", but in fact only "reclaimed" and "unreclaimed" are mutu-

---

small lots, which are thereby rendered unfit for cultivation at the same time that their value for other purposes may

have been greatly enhanced." 88 Cal. at 353, 26 P. at 242.

6. Section 3, Ch. 7 L. '23.

ally exclusive whereas, reclaimable land may be *either* reclaimed or unreclaimed. It is apparent that what the legislature had in mind was to embody in the single term "reclaimable" what in the Modesto, Fallbrook, and Kinne cases was spelled out as land which in its natural state could be benefited by, or was susceptible to irrigation. As the trial court said, reclamation is a continuing process and as soon as irrigation ceases, the reclaimed land once again becomes unreclaimed. That the lands in question are reclaimable, as distinguished from irreclaimable, is amply shown by the fact that at the time of the hearing they were almost entirely under cultivation.

■■■ We hold further that the trial court did not err in finding that a supply of water existed which could be made efficiently available by the proposed power system. When this requirement is read in light of A.R.S. §§ 30–505, subd. B [7] and 30–591, subd. A [8] it becomes apparent that what is actually the most efficient kind of power and what the means are of securing

it, need not be determined until *after* the district is formed. Here the landowners showed that there was adequate water for the area at the present time although its level was lowering; that they proposed to secure power from the Arizona Power Authority; that they would either make a transmission agreement with the Salt River Project, purchase the latter's distribution system, or construct their own facilities; and that, based upon the figures from other electrical districts, they would be able to obtain power at a lower rate than is being charged by their present suppliers. This evidence is sufficient to support the trial court's finding, even though the exact details of the proposed system would have to await the formation of the district.

## II

The Board questions the existence of a public use in the instant situation, contending that such cannot exist where the entire area is already under cultivation and the benefit to be derived from the formation of a district will not be the bringing into use

---

7. *"It shall not be necessary to determine that an underground volume of water is unquestionably sufficient to irrigate all the lands in the proposed district.* It is sufficient if the volume of water is enough to supply the area of the land within the proposed district *as will make the results of the production of power a public use and benefit to the whole district, and reasonably certain to enable the system when in full operation to be self-supporting."* (Emphasis added.)

8. *"Immediately upon qualifying, the first board of directors shall investigate the* different ways by which power can be brought into or generated within or without the district in such a manner as to be efficiently distributed to the users for irrigation purposes. *The board shall determine what kind of power is most efficient and economical and in what manner and by what means it can be secured."* (Emphasis added.)

of new lands, but merely the lowering of the cost of irrigating the old lands. A public use cannot be found here, the Board argues, in view of the fact that the phrase "introduction of power" was used in A.R.S. § 30–505, subd. A(4) when originally enacted, and "production of power" has simply been substituted by the Code Commission which had no authority to change the law. Furthermore it contends that the Arizona policy in favor of a regulated monopoly is applicable to this situation where the area is already being adequately served with power.

The act as originally adopted in Chapter 7, Laws of 1923, used the following language: a) Title: "providing for the creation of assessment districts for the purpose of *supplying* power * * *."; b) Section 1: "Assessment districts for the purpose of *securing* power * * *."; and c) Section 3 which is presently A.R.S. § 30–505, subd. A(4): "whether *on the whole,* the development reasonably certain to result from the *introduction* of power * * *." (Emphasis added.) Certainly when these sections are read together it is not at all clear that the legislature intended to limit public use to the situation in which power would be "introduced" by the formation of a district.

Two of the cases decided before the passage of the act shed some light on the legislature's intentions. In Fallbrook Irrigation District v. Bradley, supra, the U. S. Supreme Court had said 164 U.S. at 159–160, 17 S.Ct. at 63:

"* * * what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned."

The Court said that an improvement becomes a public use for the entire state even though only a small portion of a single community might directly participate in it. Then at 167, 17 S.Ct. at 66, the Court said:

"If land which can, to a certain extent, be beneficially used without artificial irrigation, may yet be so much improved by it that it will be thereby, and for its original use, substantially benefited, and, in addition to the former use, though not in exclusion of it, if it can then be put to other and more remunerative uses, we think it erroneous to say that the furnishing of artificial irrigation to that kind of land cannot be, in a legal sense, a public improvement, or the use of the water a public use."

In Kinne v. Burgess, supra, we had said in 24 Ariz. at 468–469, 211 P. at 575, in holding the 1915 act unconstitutional, that the act:

"* * * nowhere discloses that an electrical district organized thereunder, shall have, for its primary purpose, the *acquiring* of electricity to pump un-

derground water to irrigate arid lands. * * * Before the principle, upon which gravity irrigation districts are upheld, could be applied to a power irrigation district, it would be necessary that the lands proposed to be irrigated be arid lands susceptible of irrigation. *It would then subserve a public use * * *.*" (Emphasis added.)

The 1923 act was upheld in Brown v. Electrical Dist. No. 2, 26 Ariz. 181, 223 P. 1068 (1924). We said in 26 Ariz. at 188–189, 223 P. at 1070:

" 'The irrigation of really arid lands is a public purpose, and the water thus used is put to a public use; and the statutes providing for such irrigation are valid exercises of legislative power.' [9]

\* \* \* \* \* \*

"The principle is the same whether the water is lifted from a natural underground reservoir into and through canals to the land or whether it be taken by direct gravity from an artificial reservoir or from a running stream to the land. Because the method and means employed in the former case to conserve and apply water differ from the method and means used in the latter case, it should not make the service

or use any the less public or any the less entitled to support by taxation.

\* \* \* \* \* \*

" * * * *clearly here the object and purpose of procuring hydroelectric power is a public purpose, to wit, to make available for irrigation of large areas of arid lands underground water that could not otherwise be used on or applied to the said lands.*" (Emphasis added.)

It is evident from both the Kinne and Brown cases that the same criteria are to be used in finding a public use in the organization of an electrical district to furnish power for the pumping of underground water for irrigation, as are used in the organization of gravity irrigation districts. It is therefore relevant to look to Day v. Buckeye Water Conservation and Drainage District, 28 Ariz. 466, 237 P. 636 (1925), where 16,000 acres were already under cultivation when an irrigation district was formed, which district bought out the former irrigation company. We said in 28 Ariz. at 475, 237 P. at 639 [10]:

" * * * it is quite apparent that the purpose of the Wright Act is to enable an irrigation district to construct, or acquire by purchase or condemnation, or by all of said methods combined,

9. Quoted from the syllabus of the Fallbrook case, supra.

10. Quoting from Stimson v. Alessandro Irr. Dist., 135 Cal. 389, 67 P. 496, 498 (1902).

when necessary, a system of canals and waterworks which shall be the property of the district and under its control; [and] that the board of directors have power to acquire such waterworks in the manner aforesaid, and to issue the bonds of the district in payment therefor; * * *."

■ In view of these decisions we hold that the act was never meant to limit the formation of an electrical district to that situation in which the district would bring power into an area for the first time. On the contrary, where an area is under cultivation, and the organization of a district would serve to lower the cost of power so as to make available water that could not otherwise be used and in turn lower the cost of irrigation so as to prevent reclaimed lands from returning to the desert, then there may exist a public use.

■ The fact that in the instant case the district would be formed in an area now being served by other suppliers and, in effect, go into competition therewith, would not in any way negative a public use.

Electrical districts are political subdivisions of the state with all the rights, privileges and benefits thereof and entitled to the immunities and exemptions of municipalities and political subdivisions.[11] We have held [12] that the declared public policy of the state, that public utilities shall enjoy a regulated monopoly, does not apply to municipal corporations engaged in the public utility business; therefore it is likewise inapplicable to electrical districts. A.R.S. § 9–516, subd. A (1956) [13] which was passed subsequent to the Polar Water case (note 12 supra) and requires "a city or town" to acquire a "public utility service" before the former can institute a competing service in the territory already being served by the latter, is inapplicable in the instant case because the statute is concerned *exclusively* with competition by cities or towns and does not speak in terms of all municipal corporations. It is for the legislature and not this court to say that the policy expressed in A.R.S. § 9–516 is to be extended to competition by districts as well. Until such time as the legislature does speak, the fact that the proposed district will cover an area

11. Constitution of Arizona, Art. 13, § 7, A.R.S.
12. City of Tucson v. Polar Water Co., 76 Ariz. 126, 259 P.2d 561 (1953), rehearing, 76 Ariz. 404, 265 P.2d 773 (1954).
13. "It is declared as the public policy of the state that when adequate public utility service under authority of law is being rendered in an area, within or without the boundaries of a city or town, *a competing service and installation shall not be authorized, instituted, made or carried on by a city or town* unless or until that portion of the plant, system and business of the utility used and useful in rendering such service in the area in which the city or town seeks to serve, has been acquired." (Emphasis added.)

being served by some other "public utility service" will not of itself prevent the organization of a district.

Since there is evidence that the formation of an electrical district will result in such savings to the landowners in the instant case so as to enable them to pump otherwise unreachable water and prevent lands from going back to the desert, we hold that the trial court was correct in finding that there existed a public use irrespective of the fact that there is presently power, irrigation and cultivation on the lands of the proposed district.

Our original decision is therefore modified so as to conform with this decision and the judgment of the trial court is affirmed.

UDALL, V. C. J., and STRUCKMEYER, J., concur.

Note: The Honorable CHARLES C. BERNSTEIN, being disqualified, The Honorable LAURENS L. HENDERSON, Judge of Superior Court, Maricopa County, was called to sit in his stead and participate in the determination of this decision. The Honorable RENZ L. JENNINGS was also disqualified.

LAURENS L. HENDERSON, Superior Court Judge (dissenting).

For the reasons expressed in the original opinion in this case, 89 Ariz. 89, 358 P.2d 322, I dissent.