633 N.W.2d 814 (2001)
S.E. IOWA COOPERATIVE ELECTRIC ASSOCIATION, Appellant,
v.
IOWA UTILITIES BOARD, Appellee,
Office of Consumer Advocate and Mt. Pleasant Muncipal Utilities, Intervenors-Appellees.
No. 99-1376.
Supreme Court of Iowa.
September 6, 2001.
*816 Michael P. Joynt, Dennis L. Puckett, and Jill Mataya Corry of Sullivan & Ward, P.C., Des Moines, for appellant.
Allan Kniep and Vicki Place, Des Moines, for appellee Iowa Utilities Board.
Gary D. Stewart and Jennifer C. Easler, Des Moines, for intervenor-appellee Office of Consumer Advocate.
Sheila K. Tipton of Dorsey & Whitney, L.L.P., Des Moines, for intervenor-appellee Mt. Pleasant Municipal Utilities.
CADY, Justice.
This appeal requires us to determine whether economic considerations may constitute the sole basis for a finding by the utilities board that proposed electric transmission lines are necessary to serve a public use pursuant to Iowa Code section 478.4 (1995). In ruling on the petition for judicial review, the district court found the utilities board appropriately relied on resulting economic benefits in granting the electric transmission line franchises. Considering the discretion accorded to the utilities board in decisions of this nature, we agree with the district court that substantial evidence supported the agency's decision. We affirm.

I. Background Facts and Proceedings.
Mt. Pleasant Municipal Utilities (MPMU) is a municipally owned electric utility serving residential and commercial electric customers in the city of Mt. Pleasant, Iowa. Instead of generating its own electricity, MPMU purchases wholesale electric power from IES Utilities Inc. (IES) and resells the power to its customers. Because MPMU does not have direct access to IES' electric transmission system, it has to obtain power through a transmission line owned by Northeast Missouri Electric Power Cooperative (NEMO). MPMU must pay a "wheeling" fee for its use of the NEMO interconnection. A "wheeling" fee is a charge imposed on a utility for the use of another utility's transmission facilities' direct interconnection to electric power.
NEMO is an electric generation and transmission cooperative, and owns a transmission line that wheels wholesale electric power from a substation directly connected to IES' transmission line. S.E. Iowa Cooperative Electric Association (S.E. Iowa) is a member and owner of NEMO. It is subject to an all-requirements wholesale power contract in which it must fulfill all of its customers' energy requirements from NEMO. S.E. Iowa's *817 service territory surrounds Mt. Pleasant's city limits.
Associated Consultants Engineers, Inc. (ACE) conducted a power source study for MPMU in 1994, to evaluate any potential alternatives to MPMU's current wholesale power contract with NEMO. ACE found that MPMU would realize substantial cost savings if it could bypass NEMO's transmission system and receive power directly from IES. MPMU would need to construct two new transmission lines in order to establish a direct connection between its own substations and IES' transmission line. In addition, a new substation would need to be built in West Mt. Pleasant.
ACE estimated MPMU would save $1.371 million over a ten-year period. This estimate considered the construction costs of $800,000, and the projected ten-year wheeling fees of $2.171 million. In calculating the wheeling charges, ACE used the rate charged by NEMO in 1996 and assumed the rates would increase by three percent each year. Moreover, the transmission lines would be a long-term asset with a life beyond ten years. Thus, MPMU would realize additional economic benefits for an additional twenty to thirty years. Additionally, the Office of Consumer Advocate (OCA) performed a power source study, in which it also concluded the construction of the new lines would result in substantial wholesale power savings for consumers over an extended period of time.
Acknowledging the construction of additional lines would duplicate a segment of NEMO's existing lines, MPMU attempted to negotiate a plan with NEMO in lieu of construction. However, NEMO rejected MPMU's offer to purchase NEMO's existing lines, as well as MPMU's suggestion that NEMO waive or reduce the wheeling charges.
MPMU then accepted ACE's recommendation, and entered into a new wholesale power purchase contract with IES. The terms of the agreement provided that IES would bear the responsibility for the construction of the new West Mt. Pleasant substation, while MPMU would construct the new lines at its own expense.
MPMU then filed two petitions for electric transmission line franchises in accordance with Iowa Code section 478.3. One line was for 0.90 miles, while the other was for 0.62 miles. In its petitions, MPMU cited the savings that would be passed on to its customers to demonstrate the lines were necessary to serve a public use. In addition, MPMU claimed the lines represented a reasonable relationship to comprehensive electric utility planning, as the two lines would connect MPMU to IES through the new substation.
S.E. Iowa filed a petition to intervene. It contended the proposed lines did not serve a public use nor did they represent a reasonable relationship to an overall plan of transmitting electricity in the public interest as required by section 478.4. S.E. Iowa urged the administrative law judge (ALJ) to deny MPMU's petitions, arguing the lines would merely duplicate NEMO's existing facilities and would not improve service reliability.
The ALJ granted S.E. Iowa's petition to intervene and held an evidentiary hearing on MPMU's franchise petitions. The OCA entered its appearance pursuant to section 475A.2. Although the OCA supported the granting of the franchises, it proposed a modified route.
The ALJ granted MPMU's two petitions, and adopted the modified route proposed by the OCA. The ALJ based its decision on the evidence showing that MPMU would realize substantial economic benefits by means of the less expensive wholesale power it could obtain through *818 the direct connection to the IES substation.
S.E. Iowa appealed the ALJ's decision to grant the franchises to the Iowa Utilities Board (Board), and MPMU appealed the modification of its proposed route. S.E. Iowa's motion to reopen the record was granted. At an evidentiary hearing, S.E. Iowa introduced evidence of a one-time forty percent reduction in NEMO's wheeling rates for 1997 and of the circumstances surrounding NEMO and MPMU's agreement to construct a back-up interconnection. Concluding this additional evidence did not affect the ALJ's order, the Board affirmed the ALJ's decision. In doing so, however, the Board modified the order so that the lines would be constructed in the manner requested by MPMU.
S.E. Iowa filed an application for rehearing with the Board, citing new evidence. In denying the rehearing, the Board ruled that even if new evidence existed, it supported the Board's order. S.E. Iowa then petitioned for judicial review, which the district court subsequently denied.
S.E. Iowa appeals. It claims the Board erred in considering economic benefits as a sufficient basis for granting electric transmission line franchises under section 478.4, and in denying its application for rehearing.

II. Scope of Review.
Iowa Code section 17A.19(8) governs our review of administrative agency proceedings. Second Injury Fund of Iowa v. Klebs, 539 N.W.2d 178, 179-80 (Iowa 1995). We limit our review to errors at law. Iowa Code § 17A.19(8)(e); Second Injury Fund of Iowa, 539 N.W.2d at 180. We will grant the requested relief if the petitioning party's substantial rights have been prejudiced and the agency exceeded its statutory authority or abused its discretion. Iowa Code § 17A.19(8)(b), (g); Dico, Inc. v. Iowa Employment Appeal Bd., 576 N.W.2d 352, 354 (Iowa 1998); Northwestern Bell Tel. Co. v. Iowa Utils. Bd., 477 N.W.2d 678, 682 (Iowa 1991). Likewise, we will reverse or modify the agency's decision if it is not supported by substantial evidence, considering the record in its entirety. Iowa Code § 17A.19(8)(f); Second Injury Fund of Iowa, 539 N.W.2d at 180. Evidence is substantial if a reasonable person would consider it sufficient to support the agency's conclusions. Second Injury Fund of Iowa, 539 N.W.2d at 180; Northwestern Bell Tel. Co., 477 N.W.2d at 682. Thus, even if we find the record could support a different conclusion, we must affirm the agency's decision if it is supported by substantial evidence. Northwestern Bell Tel. Co., 477 N.W.2d at 682; Eaves v. Bd. of Med. Exam'rs, 467 N.W.2d 234, 237 (Iowa 1991).
We afford considerable deference to the agency's expertise, especially when the decision involves the highly technical area of public utility regulation. Equal Access Corp. v. Utils. Bd., 510 N.W.2d 147, 151-52 (Iowa 1993); Northwestern Bell Tel. Co., 477 N.W.2d at 682. Accordingly, we typically defer to the agency's informed decision as long as it falls within a "zone of reasonableness." Equal Access Corp., 510 N.W.2d at 151-52. Consequently, the majority of "disputes are won or lost at the agency level." Northwestern Bell Tel. Co., 477 N.W.2d at 682 (citation omitted).

III. Economic Considerations.
Any person or company seeking to construct an electric transmission line must first petition the Board for permission. Iowa Code § 478.1. Iowa Code section 478.3 delineates the information that must be contained in the petition, including allegations that the proposed line is "necessary *819 to serve a public use" and "represents a reasonable relationship to an overall plan of transmitting electricity in the public interest." Id. § 478.3. However, the Board can waive the showing of any allegations that do not apply to a particular proposed line. Id.; see Fischer v. Iowa State Commerce Comm'n, 368 N.W.2d 88, 93-94 (Iowa 1985). Before the Board may grant a petition for an electric transmission line franchise, it must find the proposed line is "necessary to serve a public use and represents a reasonable relationship to an overall plan of transmitting electricity in the public interest." Iowa Code § 478.4; Fischer, 368 N.W.2d at 97.
The Board in this case found MPMU's two petitions conformed to the requirements of section 478.3. MPMU alleged the cost savings that would be passed on to its customers made the proposed lines necessary to serve a public use, and the new direct interconnection between IES and MPMU represented a reasonable relationship to a comprehensive electric utility plan. In granting MPMU's franchise petitions, the Board essentially adopted MPMU's allegations when entering its requisite findings. The Board found that although MPMU primarily relied on the resulting economic benefits to support its assertions, those benefits served as a sufficient basis for granting the franchises pursuant to section 478.4.
We recognize, as did the ALJ and the Board in this case, that the Board has never before granted a petition for an electric transmission line franchise on economic considerations only. Although this is a case of first impression, this should not affect the deference we traditionally accord to the Board in public utility regulation cases. See Barron Elec. Coop. v. Pub. Serv. Comm'n of Wisconsin, 212 Wis.2d 752, 764, 569 N.W.2d 726, 732 (1997) (agency need not have addressed specific or similar issue to be entitled to deference). Our legislature gave the Board discretion to make decisions involving electric transmission lines, and we are not to question the wisdom of the legislature in doing so. See Race v. Iowa Elec. Light & Power Co., 257 Iowa 701, 707, 134 N.W.2d 335, 338 (1965); Iowa Ry. & Light Corp. v. Lindsey, 211 Iowa 544, 546-47, 231 N.W. 461, 462 (1930); see also 27A Am.Jur.2d Energy and Power Sources § 184, at 134 (1996). Moreover, we have frequently relied upon the Board's expertise in interpreting Iowa Code chapter 478. See Fischer, 368 N.W.2d at 98; Race, 257 Iowa at 707-08, 134 N.W.2d at 338-39; see also Barron Elec. Coop., 212 Wis.2d at 766, 569 N.W.2d at 733 (commission had long history of interpreting statute). Furthermore, we acknowledge the Board has previously cited economic benefits as a sufficient basis for granting gas pipeline permits under Iowa Code section 479.12. See generally In re Ag Processing Inc., Docket No. P-835, Proposed Decision and Order Granting Permit, Sept. 16, 1996; In re United States Gypsum Co., Docket No. P-833, Proposed Decision and Order Granting Permit, Mar. 21, 1996; In re Sioux City Brick & Tile Co., Docket No. P-834, Proposed Decision and Order Granting Permit, Dec. 1, 1995. Although those cases have no precedential value for chapter 478 proceedings, they are a helpful analogy when considering the Board must find the proposed project will "promote the public convenience and necessity" before issuing a gas pipeline permit pursuant to section 479.12. See Iowa Code § 479.12.
In enacting chapter 478, the legislature intended to entrust the Board with the decision whether a public use existed and, if so, the necessity of the proposed line to serve the public use. Race, 257 Iowa at 707, 134 N.W.2d at 338. The underlying purpose of chapter 478 is to serve the public interest. See id.; see also *820 27A Am.Jur.2d Energy and Power Sources § 184, at 134 ("[t]he right to regulate electric companies is measured by the public interest"). We have already found the transmission of electricity to the public constitutes a public use as contemplated by section 478.4. See Race, 257 Iowa at 704, 134 N.W.2d at 337. Thus, the remaining issue to resolve is whether the lines proposed in this case were necessary to serve that public use.
We acknowledge that the current power structure between S.E. Iowa and MPMU provides reliable and adequate service to MPMU customers. If electric utility service only concerned reliability and adequacy, a new line would not be necessary. However, utility service also has a cost, which the user ultimately is responsible to pay. Consequently, we think cost savings are a legitimate consideration in determining whether the construction of transmission lines is necessary to serve a public use. See Davis v. Brittain, 92 Ariz. 20, 30, 373 P.2d 340, 347 (1962) (customer savings may serve as basis for finding that proposed electrical district constituted public use); Niagara Mohawk Power Corp. v. Pub. Serv. Comm'n, 218 A.D.2d 421, 429, 637 N.Y.S.2d 987, 991 (N.Y.App.Div.1996) (adequacy of existing service and ability to obtain reduced electricity prices are factors to consider in finding public need). Furthermore, there is no indication in section 478.4 that the legislature intended to preclude cost savings from the Board's consideration. On the contrary, considering the broad standard of "public use" prescribed by the legislature, we find it contemplated the Board would consider economic factors. In addition, it is not uncommon for economic principles such as those used in cost-benefit analyses to be incorporated into legal principles unless the legislature has directed otherwise. See Thornhill v. Ford, 213 Miss. 49, 65, 56 So.2d 23, 30 (1952); see also Hansen v. City of San Buenaventura, 42 Cal.3d 1172, 1182, 233 Cal.Rptr. 22, 27, 729 P.2d 186, 192 (1986); Energy Ass'n of New York State v. Pub. Serv. Comm'n of New York, 169 Misc.2d 924, 936, 653 N.Y.S.2d 502, 512 (N.Y.Sup. Ct.1996); Stewart v. Pub. Serv. Comm'n, 885 P.2d 759, 773 (Utah 1994).
Moreover, cost savings can appropriately be used as a paramount factor in the construction of transmission lines. The consumer should not be held hostage by the adequacy and reliability of the existing service if comparative service can be obtained at a substantial cost savings. If comparable electric service is available to a community from a particular source at a lower cost than is provided by an existing source, and the existing source is unwilling to reduce its cost, the public is served by a law which allows them to obtain service at a lower cost. Nothing in section 478.4 indicates our legislature intended for those who first constructed transmission lines in a certain area to have legal protection from others wishing to establish lines in that same area. In fact, such a reading of the statute contravenes the objective of chapter 478 to protect the public interest, which purpose we strive to uphold when interpreting the language of section 478.4. See State v. Bartusek, 383 N.W.2d 582, 583 (Iowa 1986); N. Natural Gas Co. v. Forst, 205 N.W.2d 692, 695 (Iowa 1973).
The evidence also reveals the new power agreement between IES and MPMU will provide service comparable to that currently provided, especially if a back-up interconnection between NEMO and MPMU is established. Furthermore, the risk of power outages to MPMU customers is low. Additionally, MPMU's proposed transmission system satisfies its duty to provide adequate and efficient service at a reasonable rate. 27A Am. *821 Jur.2d Energy and Power Sources § 199, at 144. In effect, the Board in this case balanced all of these factors and determined the substantial benefits outweighed the costs and, consequently, justified the granting of MPMU's franchise petitions. See Race, 257 Iowa at 708, 134 N.W.2d at 339 (commission found benefits to public outweighed objectors' claims); see also Commonwealth Edison Co. v. Illinois Commerce Comm'n, 295 Ill.App.3d 311, 318, 319, 230 Ill.Dec. 184, 692 N.E.2d 1350, 1354-55 (1998) (commission applied balancing test to determine whether benefits exceeded costs or harms).
In engaging in this balancing test, the Board relied heavily upon the power source study conducted by ACE. We find the analysis in that study to be sufficiently reliable. We agree with the Board that the cost of the construction of the new IES substation was properly excluded from the ACE analysis, as IES agreed to incur that cost as a part of its agreement with MPMU. Likewise, other indirect project costs advanced by S.E. Iowa as inappropriately excluded by ACE, such as metering, relaying, and maintenance costs, were appropriately excluded. Even if these costs had been included, however, MPMU would still realize significant cost savings over a ten-year period. In addition, the three percent NEMO wheeling rate increase utilized by ACE was appropriate, as historical trend analysis is much more reliable than a one-time rate reduction. See In re Application by Rochester for an Adjustment of its Serv. Area Boundaries with People's Coop. Power Ass'n, Inc., 556 N.W.2d 611, 616 (Minn.Ct.App.1996) (substantial evidence existed to support commission's decision regarding wholesale rate increases). Furthermore, the ACE study does not account for the fact that the new transmission lines are long-term assets that will continue to reap benefits to MPMU and its customers for many years beyond the expiration of the initial ten-year period. See Fischer, 368 N.W.2d at 97 (consider factors other than forecast in assessing need for improved system). Nor does the ACE analysis consider the opportunities these lines will provide if the city of Mt. Pleasant experiences a surge in economic growth. See id. at 97-98 (proposed system would reasonably provide for existing as well as future needs).
Thus, considering the significant economic benefits extending to MPMU as a result of the new purchase power agreement with IES, we conclude the Board adhered to the mandates of the legislature in finding MPMU's franchise petitions were necessary to serve a public use in accordance with section 478.4. Additionally, we conclude the proposed lines represent a reasonable relationship to an overall plan of transmitting electricity, as the two new lines will provide MPMU direct access to the IES power source. See id. Not only will the new lines permit MPMU to avoid wheeling charges, they will also provide MPMU with bargaining power in negotiating wholesale power agreements. See Commonwealth Edison Co., 295 Ill. App.3d at 321, 322, 230 Ill.Dec. 184, 692 N.E.2d at 1357 (consider whether utility could exploit a monopoly position over proposed system); Energy Ass'n of New York State, 169 Misc.2d at 935, 653 N.Y.S.2d at 512 (commission may consider monopolistic marketplace in rendering decision).
We realize that this decision will result in the duplication of a portion of NEMO's existing lines. In the context of retail electric service, duplication is a legitimate consideration. Iowa Code § 476.25. In this area, our legislature has specifically declared a need for exclusive service areas to be established for specific utilities to provide electric service to avoid unnecessary duplication of facilities in the public interest. See id. However, the Board *822 considered duplication as a factor, and found it was outweighed by the benefits. See Davis, 92 Ariz. at 30, 373 P.2d at 347 ("fact that ... district would be formed in an area now being served by other suppliers... would not in any way negative a public use"); Northwestern Bell Tel. Co., 477 N.W.2d at 683 (board had authority to resolve dispute that proposed lines would duplicate existing connections); Kentucky Utils. Co. v. Farmers Rural Elec. Coop. Corp., 362 S.W.2d 498, 499 (Ky.1962) (duplication one of several factors to balance); 29 C.J.S. Electricity § 13(b), at 955 (1965) (same). Moreover, the legislature's objective in enacting section 478.4 was not to prohibit the unnecessary duplication of transmission lines, as it was in enacting section 476.25. See Barron Elec. Coop., 212 Wis.2d at 772, 773, 569 N.W.2d at 736. On the contrary, section 476.25 specifically prohibits the unnecessary duplication of electric utility facilities, while section 478.4 makes no mention of unnecessary duplication of services. See Gulf Coast Elec. Coop., Inc. v. Clark, 674 So.2d 120, 121-23 (Fla.1996) (statute specifically commands agency to consider uneconomic duplication). The factors that drive section 476.25 do not necessarily apply to chapter 478 proceedings because the objectives of the two sections are different. Section 476.25 only concerns exclusive retail electric utility service areas, not transmission line franchising. If the legislature had wanted the Board to consider the mandates of section 476.25 when considering a petition filed pursuant to section 478.4, it would have said so. See Crippen v. City of Cedar Rapids, 618 N.W.2d 562, 571 (Iowa 2000); Fed. Land Bank v. Sleister, 444 N.W.2d 504, 506 (Iowa 1989); see also Iowa Code § 478.32 (providing any company wishing to appeal Board's decision is "entitled to the rehearing procedure provided in section 476.12"). Iowa's exclusive electric service area scheme does not extend to wholesale energy suppliers. Thus, we are not to read unnecessary duplication into section 478.4 as a paramount consideration for the Board to balance in considering whether an electric transmission line franchise is necessary to serve the public use.

IV. Application for Rehearing.
S.E. Iowa contends the Board erred in denying its application for rehearing, claiming it had acquired new evidence that would materially affect the Board's order. The alleged new evidence suggested MPMU had entered into a wholesale power contract with a supplier other than IES. S.E. Iowa argued this "new" evidence would substantially change the Board's analysis concerning the proposed economic benefits that would result from the construction of the new lines. However, in denying the rehearing application, the Board ruled it had been aware of the opt-out provision of MPMU's agreement with IES which would permit MPMU to change suppliers after December 31, 2001. In fact, the Board had found this provision, together with the construction of the new lines, strengthened MPMU's bargaining power to negotiate with suppliers for more favorable rates. In its initial order, the Board had found an important economic benefit to be the bargaining power MPMU would obtain through the creation of the new lines. Thus, this alleged new evidence was yet another example of the economic benefits MPMU would realize through the granting of the electric transmission line franchises. Consequently, this evidence supported the Board's rationale and the rehearing application was appropriately denied.

V. Conclusion.
We conclude the utilities board may base its finding that a proposed electric *823 transmission line is necessary to serve a public use on economic considerations alone. We find the district court correctly upheld the Board's decision to grant MPMU's petitions for electric transmission line franchises under Iowa Code section 478.4. Additionally, S.E. Iowa's application for rehearing was properly denied by the Board.
AFFIRMED.
SNELL, S.J.,[*] participates in lieu of STREIT, J., who takes no part.
NOTES
[*] Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2001).