**Ibrahim AL–KHATTAT, Appellant,**

v.

**ENGINEERING AND LAND SURVEYING EXAMINING BOARD OF THE STATE OF IOWA, Appellee.**

No. 00–1254.

Supreme Court of Iowa.

May 8, 2002.

James C. Larew of Larew Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, and Pamela D. Griebel, Assistant Attorney General, for appellee.

CADY, Justice.

This appeal centers on an application to the State of Iowa Engineering and Land Surveying Examining Board for licensure without examination as a professional mechanical engineer under the foreign licensure comity provisions of Iowa Code section 542B.20 (1997). The Board denied the application after determining the professional examination process completed by the applicant to obtain licensure in the foreign country was not equivalent to the professional examination requirements for applicants seeking initial licensure in Iowa under section 542B.14. The district court affirmed the decision of the Board. On our review, we conclude the professional examination components of the two jurisdictions' licensure processes are designed to accomplish different purposes, and therefore are not equivalent. We affirm.

## I. Background Facts and Proceedings.

Dr. Ibrahim Al–Khattat is a sixty-three-year-old mechanical engineer. He has enjoyed a long and distinguished career in the engineering field. He was born in Iraq, and completed his secondary and college education in European institutions. In 1962, he received a Bachelor of Science degree in civil engineering from the University of Wales. In addition, he has obtained several graduate degrees from reputable United States colleges. He received a Master's of Science in applied mechanics from Kansas State Uni-

versity in 1976, a Master's of Science in mechanical engineering from Stanford University in 1979, and a Doctorate of Philosophy (Ph.D.) in mechanical engineering from Stanford in 1981.

In addition to a diverse academic background, Dr. Al–Khattat has a broad range of experiences, from research assistant, to professor of mechanical engineering, to founder of engineering corporations. At the time of this action, Dr. Al–Khattat was the founder and president of Sustainable Science International (SSI). SSI is based at the University of Iowa in Coralville, and focuses on conservation and environmental sustainability.

In 1987, Dr. Al–Khattat became registered as a charter engineer in the mechanical engineering branch of the United Kingdom. To become a member of the Institution of Mechanical Engineers in the United Kingdom, an applicant must satisfactorily complete a "professional review." In essence, the review consists of a written report, resembling an essay, and an oral interview by the applicant's peers. The report must briefly summarize the applicant's career, as well as contain a detailed description of at least one significant project demonstrating the engineering experiences of the applicant. The peer interviewers derive their questions for the oral interview from the prepared report.

The purpose of the interview is to examine the applicant's professional judgment, problem-solving and decision-making capabilities, and the breadth of the responsibilities afforded to the applicant in his or her experiences. Although the oral interview

is designed to evaluate the applicant's professional development following the attainment of an accredited college degree, the interview is tailored to the specific applicant. The questions only concern the projects and experiences listed in the applicant's written report.

In Dr. Al–Khattat's professional review, the written report and oral interview primarily focused on the dissertation he prepared for his Ph.D. In general, Dr. Al–Khattat explained the justifications supporting the conclusions he reached in his dissertation. This included the physical, theoretical, experimental, and computational reasoning underlying his conclusions. Additionally, Dr. Al–Khattat discussed the credibility and practicality of mathematical modeling and numeric analyses of engineering systems and processes.

Dr. Al–Khattat applied for a comity license in mechanical engineering with Iowa's Engineering and Land Surveying Examining Board on April 30, 1997. Because he had been licensed as a professional mechanical engineer in the United Kingdom, Dr. Al–Khattat believed he could be licensed without further examination in Iowa pursuant to Iowa Code section 542B.20.

The Board denied the application. The Board concluded the licensing process in the United Kingdom was not based on requirements and qualifications equal to those imposed on applicants seeking licensure by examination in Iowa. Thus, the Board found Dr. Al–Khattat's failure to pass the Principles and Practice of Engineering examination,[1] or an equivalent ex-

---

1. In 1995, Dr. Al–Khattat took the Principles and Practice of Engineering examination while working in the state of Oregon. Although Dr. Al–Khattat was informed that the practice examination was an open-book test in which examinees were expected to bring a calculator and reference books, he brought

neither testing aid. At the contested case hearing before the Board, Dr. Al–Khattat explained he was only taking the test for "educational curiosity," and to compare the exam with the professional exam he was subjected to in the United Kingdom. Consequently, he failed the practice exam. However, he did

amination offered by another jurisdiction, precluded his licensure in Iowa based on the failure to satisfy the requirements of section 542B.14(1)(d). The Board again denied Dr. Al–Khattat's application after entertaining his request for reconsideration.

A contested case hearing was then held in accordance with Iowa Administrative Code rule 193C—1.11(1) (1998). Three witnesses testified at the hearing. One witness was the Board's executive officer, who acknowledged that the Board has never granted a comity license to an applicant from a foreign country or another state who has not passed the Principles and Practice of Engineering examination. Another witness was the director of examination development for the National Council of Examiners for Engineers and Surveyors (NCEES). The NCEES produces and scores the Fundamentals and Principles and Practice of Engineering examinations administered by states, such as Iowa, for engineering and land surveying licensure. In designing the exams, the NCEES surveys engineers to determine what knowledge and tasks demonstrate minimal competence in the profession. The director also explained the various purposes underlying the two exams. The Fundamentals exam, given in Iowa to satisfy the requirements of section 542B.14(1)(b), is designed to test the examinee's understanding of general engineering principles. On the other hand, the Principles and Practice of Engineering exam, given in Iowa to satisfy the requirements of section 542B.14(1)(d), evaluates the thinking process utilized by the examinee in solving the engineering problems.

Dr. Al–Khattat also testified. He explained the United Kingdom's licensure process, and submitted a ninety-three-page report he prepared comparing the licensure processes of the United Kingdom and Iowa. Dr. Al–Khattat acknowledged the oral interview was essentially a "mini-defense" of his Ph.D. dissertation, and that it did not require him to solve any mechanical engineering problems. Instead, the United Kingdom licensure process was an individualized process, involving a summary of an individual's experience and an analysis of whether the particular individual should become a licensed engineer.

Following the hearing, the Board entered a written ruling denying Dr. Al–Khattat's application for a comity license. As in its earlier decisions, the Board relied on its conclusion that the evidence failed to demonstrate that Dr. Al–Khattat passed a professional examination in the United Kingdom equivalent to the NCEES Principles and Practice of Engineering examination required for initial licensure under section 542B.14.

Dr. Al–Khattat then petitioned for judicial review pursuant to section 17A.19. The district court denied the petition. It found the Board's decision was supported by substantial evidence.

■ Dr. Al–Khattat appeals. He contends the district court erred in upholding the Board's conclusion that he did not successfully pass an examination designed to determine an applicant's proficiency to practice engineering. Additionally, he contends the Board engaged in illegal informal rulemaking by requiring comity license applicants to pass the Principles and Practice of Engineering examination.[2]

pass the Fundamentals exam, which is an eight-hour, closed-book examination.

**2.** We find Dr. Al–Khattat failed to preserve his argument that the Board engaged in illegal

informal rulemaking when it provided him with a list of foreign credentials required for comity applicants seeking licensure in Iowa. Because this issue was not clearly raised before the agency, we deem it unpreserved for

## II. Standard and Scope of Review.

 We review the denial of a petition for judicial review for errors at law. *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 830 (Iowa 2002). When evaluating the validity of agency action, we consider the standards delineated in section 17A.19(8) to determine if our conclusions align with those of the district court. *Id.; Wieslander v. Iowa Dep't of Transp.*, 596 N.W.2d 516, 520 (Iowa 1999). Thus, we confine our review to "whether the district court correctly applied the law." *Id.*

 We will reverse the agency's action only if it is not supported by substantial evidence in the record, *S.E. Iowa Coop. Elec. Ass'n v. Iowa Utils. Bd.*, 633 N.W.2d 814, 818 (Iowa 2001), or if the agency acted unreasonably, arbitrarily, or capriciously in rendering its decision. 53 C.J.S. *Licenses* § 43(c), at 389 (1987). An agency decision is supported by substantial evidence when a reasonable person could reach the same conclusions after considering the record in its entirety. *S.E. Iowa Coop. Elec. Ass'n*, 633 N.W.2d at 818; *Madrid Home for the Aging v. Iowa Dep't of Human Servs.*, 557 N.W.2d 507, 510 (Iowa 1996). Consequently, even if we find the evidence capable of supporting a conclusion different from that reached by the agency, we must affirm if we can find substantial evidence in the record to support the agency's determination. *Id.* Moreover, we must seek to uphold the agency's decision by liberally construing its factual findings. *Wieslander*, 596 N.W.2d at 520.

 Lastly, we defer to an agency's construction of statutes and rules within the agency's expertise, unless the interpretation is erroneous or unreasonable. *Madrid Home for the Aging*, 557 N.W.2d at 511; 53 C.J.S. *Licenses* § 43(c), at 389. This is particularly true in the case of statutes and regulations entrusted to agencies responsible for licensing professionals. *See* 53 C.J.S. *Licenses* § 43(c), at 389; *see also S.E. Iowa Coop. Elec. Ass'n*, 633 N.W.2d at 818 (afford considerable deference to agency charged with making decisions concerning "the highly technical area of public utility regulation"). Therefore, we generally affirm the informed decision of the agency, and refrain from substituting our less-informed judgment. *Id.*

## III. Denial of Comity Licensure.

There are two ways to become licensed as a professional engineer in Iowa: (1) licensure by examination; and (2) licensure by comity. The first method applies to applicants seeking original licensure as a professional engineer in Iowa. To obtain initial licensure, an applicant must satisfy each of the following requirements:

> *a.* (1) Graduation from a course in engineering of four years or more in a school or college which, in the opinion of the board, will properly prepare the applicant for the examination in fundamental engineering subjects.
>
> . . . .
>
> *b.* Successfully passing a written, oral, or written and oral examination in fundamental engineering subjects which is designed to show the knowledge of gen-

---

our review. *Wieslander v. Iowa Dep't of Transp.*, 596 N.W.2d 516, 525 (Iowa 1999). Moreover, this issue was not addressed in the district court's ruling on the petition for judicial review. If Dr. Al–Khattat had in fact raised the issue of informal rulemaking before the district court, he should have filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2) requesting the court to enlarge its findings of fact and conclusions of law. *See Meier v. Senecaut, III*, 641 N.W.2d 532, 538 (Iowa 2002) (referring to former procedural rule 179(b), which is now renumbered as rule 1.904(2)).

eral engineering principles.... [i.e., the Fundamentals of Engineering examination]

c. ... [A] specific record of four years or more of practical experience in engineering work which is of a character satisfactory to the board.

d. Successfully passing a written, oral, or written and oral examination designed to determine the proficiency and qualifications to engage in the practice of engineering.... [i.e., the Principles and Practice of Engineering examination]

Iowa Code § 542B.14(1). The NCEES prepares the two examinations administered to initial licensure applicants. Iowa Admin. Code r. 193C—1.4(4) (1997). Both are written, uniform examinations. *Id.* The Fundamentals exam "covers general engineering principles," *id.* r. 193C—1.4(4)(a), and is intended to satisfy the requirements of section 542B.14(1)(b), while the Principles and Practice exam addresses "proficiency and qualification to engage in the practice of professional engineering," *id.* r. 193C—1.4(4)(b), and is intended to satisfy the requirements of section 542B.14(1)(d).

The second method, comity licensure, is available to those who have been previously licensed in another jurisdiction and have satisfied specific circumstances. *See Arizona State Bd. of Accountancy v. Cole,* 119 Ariz. 489, 581 P.2d 1139, 1142 (1978) (purpose of comity licensure is to grant licensed status when specific factors are fulfilled, not to automatically recognize licenses held in foreign jurisdictions). Comity applicants may receive professional licensure in Iowa without further examination if the original license is active, Iowa Admin. Code r. 193C—1.4(5), and was based on requirements and qualifications equivalent to the requirements of chapter 542B.[3] Iowa Code § 542B.20.

Section 542B.20 establishes the requirements for this second method of licensure, and provides that a person holding a certificate of licensure as a professional engineer issued by the proper authority of a foreign country "based on requirements and qualifications" which, "in the opinion of the board," are "equal to or higher than the requirements" of chapter 542B may be licensed without examination. *Id.* Because the licensure requirements of chapter 542B are found in section 542B.14, the four requirements for licensure by examination under section 542B.14 must therefore be considered in determining whether the re-

---

3. Although inapplicable to this case, we believe it is important to note recent amendments to the administrative rules governing the Board when ruling on applications for comity licensure. First, an applicant will be considered for comity licensure only if his or her original license is in active status and was *"based on approved examination."* Iowa Admin. Code r. 193C—1.4(5) (2001) (emphasis added). Furthermore, the new rules contain a more explicit explanation of what factors the Board must consider in comparing a foreign license with the standards of section 542B.14. For example, the Board must individually consider each of the four licensing prerequisites of section 542B.14, and the superior satisfaction of one prerequisite will not mitigate the failure to comply with another.

Iowa Admin. Code r. 193C—4.2. In addition, the rules guide the Board in its comparison of NCEES and non-NCEES examinations. The rule states, in pertinent part:

A non-NCEES professional examination, for instance, must be designed to determine whether a candidate is minimally competent to practice professional engineering in a specific branch of engineering .... The examination must be written, objectively graded, verifiable, and developed and validated in accordance with the testing standards of the American Psychological Association or equivalent testing standards. *Free-form essays and oral interviews ... are not equal or superior to NCEES examinations* ....

*Id.* r. 193C—4.2(3)(d) (emphasis added).

quirements of licensure by comity have been satisfied.

■ Dr. Al–Khattat sought professional licensure through the comity provisions of section 542B.20. The Board did not dispute Dr. Al–Khattat's satisfaction of the educational and practical experience requirements of section 542B.14(1)(a) and (c). Furthermore, because Dr. Al–Khattat passed the Fundamentals examination in 1995, the Board found he also satisfied section 542B.14(1)(b).[4] Instead, the Board concluded the United Kingdom's professional examination was not equivalent to the Principles and Practice of Engineering examination given to applicants for licensure by examination to satisfy section 542B.14(1)(d).

Dr. Al–Khattat claims the Board essentially precludes all comity licensure for any engineer from a foreign country by requiring proof that the examination taken to obtain the foreign license was equivalent to or superior to the NCEES examination taken by applicants for licensure by examination in Iowa. He claims the comity licensure statute does not require a comparison between the foreign examination and the NCEES examination to determine if they are equivalent, but only requires a determination by the Board that the foreign examination passed by the applicant to obtain the foreign license was, like the

NCEES examination, "designed to show the knowledge of general engineering principles" and "designed to determine the proficiency and qualifications to engage in the practice of engineering." *See id.* § 542B.14(1)(b), (d). Thus, any comparison by the Board must relate to the design of the tests, not the mechanics, scoring, or other aspects of the tests.

■ We agree with Dr. Al–Khattat that the comity licensure statute only requires the foreign license to be based on the "requirements and qualifications ... equal to or higher than the requirements" for licensure by examination in Iowa. *See id.* § 542B.20. This means a comity applicant must show, together with the education and experience prerequisites, that the foreign license was predicated on passing an examination in fundamental engineering subjects "designed to show the knowledge of general engineering principles" and an examination "designed to determine the proficiency and qualifications to engage in the practice of engineering." *See id.* § 542B.14(1)(a)-(d). This standard does not require the mechanics of the foreign examinations to mirror those of the NCEES examinations administered to applicants in Iowa. There may be many differences in the types and methods of examinations that nevertheless have the same design or purpose. The Board must

---

4. Although not determinative of our analysis in this case, we must comment on the Board's incorrect application of the Fundamentals examination requirement of section 542B.14(b). The Board erred in considering Dr. Al–Khattat's passing score on the Fundamentals examination. When an applicant seeks licensure by comity, the licensing authority is to only look at the requirements and qualifications that served as the basis of the issuance of the foreign license. Iowa Code § 542B.20; *accord Tinner v. Dist. of Columbia Dep't of Consumer & Regulatory Affairs,* 703 A.2d 833, 836 (D.C.Ct.App.1997). The Board is not to consider intervening factors, such as the suc-

cessful completion of an exam subsequent to obtaining initial licensure. *See Tinner,* 703 A.2d at 836.

Nevertheless, we find Dr. Al–Khattat did in fact satisfy the requirements of section 542B.14(b). The Fundamentals examination is waived for applicants who have received a Ph.D. from a United States institution and an accredited Bachelor of Science engineering degree. Iowa Admin. Code r. 193C—1.4(3) (1997). Because Dr. Al–Khattat has reached the requisite educational levels, he was not required to pass a Fundamentals examination or its equivalent.

determine if the examination component for foreign licensure met the design of the examination components for licensure by examination under section 542B.14.

Clearly, the Board placed considerable emphasis on the numerous mechanical differences in the United Kingdom examination and the NCEES examination. Yet, differences in the mechanics and approach taken between two examinations, although not alone determinative, can be helpful to ascertain the design and purpose of each examination.

As mentioned, the NCEES principle and practice examination is clearly designed to test an applicant's overall proficiency in the general practice of mechanical engineering. It conforms to the design contemplated by section 542B.14(1)(d). It is a uniform, standardized, objective examination, and is not tailored to a specific applicant's area of expertise within a particular engineering branch. The exam concentrates on general problem-solving ability. It consists of two parts. The first part requires the examinees to show their calculations. The examinee receives points for each level reached in solving the problem. The second part is a multiple-choice format. In both exams, the problem content covers a variety of problems encountered in the mechanical engineering profession.

In contrast, the United Kingdom professional examination is tailored to an appli-cant's particular accomplishments and experiences. Although the United Kingdom professional examination may in fact be designed to determine a particular individual's competence, it focuses on proficiency in a specific discipline. In essence, as characterized by Dr. Al–Khattat, the United Kingdom licensure process is "an oral evaluation of the candidate based on the facts that he [or she] provides." The peer interview does not address problems affecting the general practice of mechanical engineering, other than what issues were presented by the applicant's written report. In Dr. Al–Khattat's case, the peer interview primarily concerned his Ph.D. dissertation regarding metal forming plasticity applications. Thus, he was only required to demonstrate his proficiency in this specialized area of mechanical engineering. The exam seems to assume general competency in the field of engineering.[5]

We think the differences in the United Kingdom examination and the NCEES examination reveal that the design of the United Kingdom examination taken by Dr. Al–Khattat to obtain his license was not to "determine the proficiency and qualifications to engage in the practice of engineering." The "practice of engineering" covers a broad range of areas, and the evidence submitted to the Board shows that the United Kingdom examination, as a separate requirement for licensure in the United Kingdom, is geared towards proficiency

**5.** We reached this conclusion by examining the two methods of licensure in the United Kingdom. The first method is the professional review process completed by Dr. Al–Khattat. The second method applies to applicants who have not received an engineering degree from an accredited institution. These applicants must successfully pass a series of standardized, written examinations. The first series appears to cover general engineering subjects, such as mathematics and engineering perspectives and skills. The objective of this examination is to test the applicants' understanding of fundamental techniques and concepts required to solve engineering problems. The second series involves the testing of more complicated engineering subjects. Because Dr. Al–Khattat had attained the requisite education level, he was exempted from the written examination requirements. Thus, if an applicant has obtained an engineering degree, competency in fundamental engineering concepts is presumed.

in a particular area practiced by the applicant, not the general practice of engineering. This evidence supports the finding made by the Board that the certificate of licensure held by Dr. Al–Khattat was not based on the requirements and qualifications equal to those found in chapter 542B.

 We acknowledge the distinguished career attained by Dr. Al–Khattat as an engineer. He has reached a level of education and experience beyond that required under section 542B.14. Yet, our licensing requirements do not substitute experience for the lack of compliance with a professional examination requirement. The Board carefully considered the content and purposes of the two examinations before making its decision. This is not a case where the Board failed to even make a comparison. *See Fiber v. New Mexico Bd. of Med. Exam'rs,* 93 N.M. 67, 596 P.2d 510, 512 (1979). Furthermore, the Board has consistently interpreted section 542B.20 to reject comity licensure where the applicant has not satisfied standards comparable to those required of initial licensure applicants in Iowa. *See Horner v. State Bd. of Eng'g Exam'rs,* 253 Iowa 1, 8–9, 110 N.W.2d 371, 375 (1961). No evidence was produced indicating the Board has issued comity licensure to an applicant who has not taken an examination comparable in design to the Principles and Practice of Engineering examination. The consistent application of comity licensure requirements suggests the Board did not act arbitrarily or capriciously in rendering its decision in this particular case. *See Binkley v. Zollar,* 289 Ill.App.3d 189, 224 Ill.Dec. 171, 681 N.E.2d 153, 155 (1997); *State Bd. of Registration for Prof'l Eng'rs v. Eberenz,* 723 N.E.2d 422, 431 (Ind. 2000).

 Furthermore, the legislature entrusted the Board to exercise its expertise in determining the requisite qualifications of licensure applicants. *Horner,* 253 Iowa at 6, 110 N.W.2d at 373. In a case such as this, where the decision is close, we will not second-guess the importance the Board places on the professional examination requirement. We find substantial evidence supports the Board's determination that Dr. Al–Khattat failed to successfully complete an examination designed to demonstrate his proficiency to engage in the practice of engineering.

## IV. Conclusion.

We conclude there is substantial evidence in the record to support the Board's finding Dr. Al–Khattat's foreign license was not based on requirements and qualifications equal to the requirements of section 542B.14(1). Thus, the district court correctly denied the petition for judicial review.

**AFFIRMED.**